[No. 34636.  *En Banc.*  February 3, 1960.]

THE STATE OF WASHINGTON, *Respondent,* v. DAVID D. BECK, *Appellant.*[1]

*Ferguson & Burdell, Charles S. Burdell, Donald McL. Davidson,* and *John J. Keough,* for appellant.

*Charles O. Carroll* and *Charles Z. Smith,* for respondent.

PER CURIAM.— ■ One of the judges of this court disqualified himself from participating in the decision of this case. The eight remaining judges, after numerous conferences, are equally divided in their decision for the reasons appearing in the opinions filed.

There being no majority for affirmance or reversal, the judgment of the trial court stands.

It is so ordered.

HILL, J.—This is an appeal from a judgment and sentence entered upon a verdict of guilty to a charge of grand larceny by embezzlement. Twenty-nine assignments of error raise a multiplicity of issues.

The trial itself, divorced from the prominence of the defendant, presents a very simple factual issue.

The state's evidence showed that the defendant had possession of a 1952 Cadillac automobile, belonging to the Western Conference of Teamsters; that he authorized its sale;

[1] Reported in 349 P. (2d) 387.

that it was sold for nineteen hundred dollars, and the proceeds of the sale were deposited in one of his personal accounts over which he had exclusive control; that the Western Conference of Teamsters never received any part of the nineteen hundred dollars.

To meet this evidence in support of the charge that he did ". . . wilfully, unlawfully and feloniously secrete, withhold or appropriate the said $1,900 to his own use with intent to deprive and defraud the owner thereof;"

there was testimony that the defendant thought the car was sold while he was out of the city; that when he returned and found that the car had been sold and the purchase price had been deposited in his account, he delivered nineteen hundred dollars to a bookkeeper and told him to apply it to the account of either the Western Conference of Teamsters or the Joint Council of Teamsters, whichever owned the car. It was patently a defense that could be contrived to meet the exigencies of the case.

The state's case was clear and unchallenged. The basic issue for the determination of the jury was whether or not it believed the explanation presented by the defense. The verdict of guilty was the jury's answer to that issue.

We shall adopt the appellant's ten divisions for the consideration of the twenty-nine assignments of error.

I. GRAND JURY PROCEEDINGS. This is the longest section of appellant's brief (some 66 pages).

We disagree completely with the appellant as to the function of a grand jury in this state. In the period when an indictment by a grand jury was a prerequisite to a prosecution for a felony, it was said (and the appellant seems to have assumed its present day applicability) that a grand jury was meant to be a shield between the defendant and the zeal of the prosecutor. For the most part, the cases upon which the appellant relies come either from the time when a grand jury indictment was necessary, or from jurisdictions where it is still a requisite.

The grand jury in this state is not and was not intended

to be a shield for the accused. Our state constitution provides that,

". . . Offenses heretofore required to be prosecuted by indictment may be prosecuted by information, or by indictment, as shall be prescribed by law." Art. I, § 25, Washington state constitution.

Furthermore,

". . . No grand jury shall be drawn or summoned in any county, except the superior judge thereof shall so order." Art. I, § 26, Washington state constitution.

The prosecutor's information has become the standard means of bringing charges in this state, as in all other states which authorize its use. It has long been settled that there is no denial of Federal constitutional rights involved in the substitution of the prosecutor's information for the grand jury's indictment. *Hurtado v. People of California* (1884), 110 U. S. 516, 4 S. Ct. 111; *State v. Nordstrom* (1893), 7 Wash. 506, 35 Pac. 382; affirmed 164 U. S. 705.

The grand jury is now used not as a shield against the zealous prosecutor, as in times past, but to replace, on occasion, the prosecutor who is not sufficiently zealous (for whatever reason), and, more often, as presently, as a valuable but expensive weapon (hence, used sparingly) to assist a prosecutor in investigating conditions and people insulated from investigation by the usual procedures. It has been said that,

"The inquisitorial power of the grand jury is the most valuable function which it possesses to-day and, far more than any supposed protection which it gives to the accused, justifies its survival as an institution. As an engine of discovery against organized and far-reaching crime, it has no counterpart. . . ." *In re Grand Jury Proceedings*, 4 F. Supp. 283, 284 (E. D. Pa. 1933).

It must be accepted for what it is: an inquisitorial body, an accusing body, and not a trial court. Its functions are investigative and not judicial. It is not concerned that the evidence, then available, establish the commission of crime beyond a reasonable doubt. *State v. Lawler* (1936), 221 Wis. 423, 267 N. W. 65, 105 A. L. R. 568. The end result

of a grand jury's deliberations is not a judgment and sentence, but merely a charge; consequently, the concepts of procedural due process do not apply to the grand jury, except as they may be necessary to prevent prejudice to an accused or a witness in subsequent proceedings; thus, a grand jury may not deny the constitutional privilege against self incrimination, and it may not impair the constitutional protection against unreasonable searches and seizures.

The grand jury is "the voice of the community accusing its members," (Judge Learned Hand in *In re Kittle*, 180 Fed. 946, 947 (S. D. N. Y. 1910)), and it may properly reflect the sentiment of the community. It

". . . breathes the spirit of a community into the enforcement of law. Its effect as an institution for investigation of all, no matter how highly placed, creates the elan of democracy. . . ." *United States v. Smyth*, 104 F. Supp. 279, 291 (N. D. Cal. S. D. 1952).

The appellant, on the other hand, suggests that the grand jurors were disqualified because they presumably reflected the sentiment of the community from which they came. The inference from the appellant's argument is that a person who can secure a large amount of adverse publicity from newspapers, radio, and television, thereby becomes immune from grand jury investigation; the more notoriety he achieves, the more reason he should not be investigated.

Investigative agencies—city, county, state, or federal— do not wait for the hue and cry to die down before they begin to investigate or to file a charge against an accused. Nor do we see why a grand jury investigation should be handicapped or delayed because of publicity of whatever kind or character. Because a grand jury merely makes the accusation and does not try the accused, the general rule is that, barring statutory provisions to the contrary, bias or prejudice on the part of one or more of the grand jurors is not a ground for quashing the indictment. In *United States v. Knowles*, 147 F. Supp. 19, 21 (D. C. 1957), it was said,

"The basic theory of the functions of a grand jury, does not require that grand jurors should be impartial and unbiased. In this respect, their position is entirely different

from that of petit jurors. The Sixth Amendment to the Constitution of the United States expressly provides that the trial jury in a criminal case must be 'impartial'. No such requirement in respect to grand juries is found in the Fifth Amendment, which contains the guaranty against prosecutions for infamous crimes unless on a presentment or indictment of a grand jury. It is hardly necessary to be reminded that each of these Amendments was adopted at the same time as a part of the group consisting of the first ten Amendments. A grand jury does not pass on the guilt or innocence of the defendant, but merely determines whether he should be brought to trial. It is purely an accusatory body. This view can be demonstrated by the fact that a grand jury may undertake an investigation on its own initiative, or at the behest of one of its members. In such event, the grand juror who instigated the proceeding that may result in an indictment, obviously can hardly be deemed to be impartial, but he is not disqualified for that reason."

In *Coblenz v. State* (1933), 164 Md. 558, 166 Atl. 45, 88 A. L. R. 886, 894, 895, it is said:

" . . . we find no ground for imposing a requirement that they must be unprejudiced, as the objection demands. On the contrary, such a requirement would seem inconsistent with their freedom to accuse upon their own knowledge, for persons who come with knowledge sufficient to serve as a basis of indictment are likely to come with the conclusion and prejudice to which that knowledge leads. They must act upon their own convictions, after conferring secretly and without any interference; but they are not required to come without any prejudice. . . . "

And in *United States v. Rintelen*, 235 Fed. 787 (S. D. N. Y. 1916), Judge Augustus N. Hand said (p. 789),

" . . . An intelligent grand juror can hardly be found who has not decided opinions derived from his general knowledge as to any case of public notoriety. He may have even passionate feelings on the subject, which in general affect and actuate him. The question is not what his feelings were, but whether he voted for an indictment honestly and upon competent evidence. That an indictment can be quashed because the grand jurors had personal prejudices, even ill-founded ones, would leave every indictment in an important case, irrespective of the evidence on which it was found, open to attack. . . . "

We reiterate, as the quoted authorities establish, that the general rule is that, barring statutory provisions to the contrary, bias or prejudice on the part of one or more of the grand jurors is not a ground for a quashing of a grand jury indictment, or for setting aside the judgment based on the verdict of a petit jury after a trial on such an indictment. The appellant says our consideration of this case must be based upon the premise that he, as a matter of law, was entitled to an impartial and unprejudiced grand jury.

If we assume that the premise is correct, we are confronted with the fact that there is no showing that any member of the grand jury was biased or prejudiced against the appellant. His contention is that some or all of the members of the grand jury must be biased or prejudiced against him because of the unfavorable publicity which he had received. Jury verdicts will not be set aside on such unsupported suppositions.

However, the premise is not correct unless, as the appellant urges, our 1854 grand jury statute requires that grand jurors be impartial and unprejudiced. The only support for the suggestion that there is such a statutory requirement is contained in one section which relates to the long-gone situation where a grand jury met for the purpose of considering whether persons then in custody or released on bail and "held to answer for an offense" should be indicted or released. Such a person might challenge the panel because it was not drawn properly (RCW 10.28.010), or might challenge individual grand jurors

". . . for reason of want of qualification to sit as such juror; and when, in the opinion of the court, a state of mind exists in the juror, such as would render him unable to act impartially and without prejudice." RCW 10.28.030.

There was a reason for such a challenge by a "person in custody or held to answer for an offense," but the appellant was not such a person. When a modern grand jury starts its investigative process it seems ridiculous to suggest that as each new personality comes under scrutiny the proceedings must stop until it can be determined whether any member of the grand jury is biased or prejudiced against him;

and, if a grand juror is so biased or prejudiced, the investigation is at an end. Such a situation was not contemplated, even in territorial days, for our statute provides that a grand juror *must* testify of his own knowledge of offenses committed, and this testimony may initiate such investigation as would lead to an indictment. RCW 10.28.130. A grand juror so testifying is disqualified from joining in the deliberations and voting. RCW 10.28.140. Both sections assume that a grand juror so testifying is properly a member of the panel, and, as stated in *Coblenz v. State, supra,* any requirement that such grand juror be completely unprejudiced is inconsistent with his right and obligation to share his information with the grand jury.

To summarize this phase of the case:

1. We are unable to conclude that because a statute gave "any person in custody or held to answer for an offense" the right to challenge a grand juror for prejudice, there is a statutory or any other requirement that grand jurors be without bias or prejudice against any one indicted by them. Persons for whose benefit that statute was enacted are of course entitled to its protection.

2. That, absent such statutory requirement, bias or prejudice on the part of one or more of the grand jurors is not a ground for setting aside a judgment based on a verdict of guilty returned by a petit jury.

3. There is no showing of bias or prejudice.

The charge to the grand jury is criticized and said to constitute prejudicial error. As we have indicated, a grand jury in this state is convened only for a special purpose. It was not necessary to leave to the clairvoyant powers of this grand jury the determination that they had not been called to investigate all of the persons then held in the King county jail on felony charges, as RCW 10.28.010 and 10.28-.030 seem to contemplate; and it was proper to advise them they had been called for a special purpose.

It is stated, as a general rule, that the court has a wide discretion in calling matters of concern to the attention of the grand jury. 24 Am. Jur. 864, Grand Jury, § 45; 38 C. J. S. 1012, Grand Juries, § 21 (b). Some courts have said

that the court's charge to the grand jury is not subject to judicial review. *United States v. Smyth, supra; Bethel v. State* (1924), 162 Ark. 76, 257 S. W. 740, 31 A. L. R. 402; *State v. Lawler, supra.* As Judge James Alger Fee said in his opinion in *United States v. Smyth, supra,* in discussing the subject of grand jury instructions (p. 292),

" . . . He [the court] may give instructions which do not constitute precedents and which cannot be controlled or corrected by appellate courts. These may be political manifestoes. They may be entirely erroneous. These may include cautions and admonitions to fit local conditions and guard against dangers which the judge believes exist at the moment. . . ."

and, in a footnote (36), he says,

"There has never been an instance where instruction to a grand jury was held error by an appellate court. If the indictment is good and the trial fair, that ends the matter, irrespective of what the judge may have said to the grand jury."

It must be remembered that it was not only the prerogative but the duty of the superior court to direct the grand jury's attention to those matters which the superior court judges, who had called the grand jury, believed to merit investigation by it. In so doing, it was proper for the court to make note of facts publicly known and allegations publicly heard, as a frame of reference from which the grand jury should begin its investigation.

Chief Justice Vanderbilt, speaking for the supreme court of New Jersey, has said,

"While the grand jury is an independent body in investigating the facts and in making presentments and indictments, it necessarily looks to the judge presiding in the county not only for instructions on the law to govern its deliberations in particular matters but also as to the matters of crime or of public concern that should receive its attention. Any unusual matter such as the conditions in the Camden County Jail manifestly calls for specific instructions, if the criminal law is to be adequately enforced and if the public interest in the efficient administration of public institutions is to be maintained. . . ." *In re Camden*

*County Grand Jury* (1952), 10 N. J. 23, 34, 89 A. (2d) 416, 423.

The extent of our review of the charge, if we have any right to review it, is clearly limited, as stated in the opinion in *Wheeler v. State* (1953), 219 Miss. 129, 63 So. (2d) 517, to whether or not the (p. 144)

". . . language in the judge's charge had the effect of dictating to or coercing the grand jury into returning an indictment against the appellant. . . ."

We are unable to see any element of dictation or coercion in the charge to the grand jury in this case. The court did only what it should have done in directing the grand jury's attention to the reason why it was called.

We turn now to the claimed misconduct of the prosecutor before the grand jury. The appellant attempts to apply the standards of a trial to a grand jury investigation.

Of course, the grand jury must be free from all outside interference and influence during its deliberations and voting, and this requires that no parties other than the grand jurors themselves be present at such time. Cases such as *Attorney General v. Pelletier* (1922), 240 Mass. 264, 134 N. E. 407; *Williams v. State* (1919), 188 Ind. 283, 123 N. E. 209; *United States v. Wells,* 163 Fed. 313 (D. C. Idaho 1908), are decided upon this principle of protection of the grand jury's deliberations, and they have no bearing on the present case.

The appellant quotes from *United States v. Wells, supra.* It is interesting to note that Judge Hand in *United States v. Rintelen, supra,* in discussing claimed misconduct of the district attorney, said of that case (p. 792),

"The case relied upon by the defendants is United States v. Wells, 163 Fed. 313. There the district attorney not only gave the grand jury a list of the defendants and commented on the weight of the evidence, but before the indictment was signed was requested to leave the room by one of the jurors, so that there could be discussion, and refused to go, said that no discussion could be had until the indictment was signed, directed the foreman to sign the indictment without permitting further consideration or reading of the

indictment, and withheld various documents from the inspection of the grand jury, the contents of which they were obliged to take from the statements of the district attorney only. It is manifest that the facts of that case were utterly different from those of the case at bar. The indictment there was evidently controlled by the district attorney, was not the finding of the grand jury, and consequently the plea in abatement was there properly sustained. I am referred to no other decision than United States v. Wells, supra, where an indictment has been held bad by reason of the conduct of a district attorney before the grand jury."

Judge Hand then emphasized that the independence and freedom from coercion on the part of the grand jurors is the thing to be protected, and said (pp. 794, 795),

" . . . A plea based on the conduct of the district attorney before the grand jury should be adjudged insufficient unless it clearly shows prejudice to the defendant and indicates that the alleged irregularities affected the action of the grand jury. That this is the proper rule appears from various decisions. *Agnew v. United States,* 165 U. S. 36, 17 Sup. Ct. 235, 41 L. Ed. 624; *United States v. American Tobacco Co.,* 177 Fed. 774; *United States v. Nevin,* 199 Fed. 833; *United States v. Gradwell,* 227 Fed. 243. The dictum in *United States v. Wells, supra,* so far as it is not in accord with the rule I have laid down, does not follow the weight of authority."

He said, also, that if

" . . . a comment by the district attorney, on the testimony were held in itself to invalidate an indictment, the opportunity for technical motions and dilatory pleas in criminal cases would be greatly enlarged."

Where the prosecutor is properly in attendance during the examination of witnesses, we find a significant lack of precedents concerning judicial review or control of his conduct of such examinations. The conclusion must be that the examination of witnesses before a grand jury has never been intended to be a matter of judicial control as in the examination of witnesses before a petit jury.

Nor does this constitute any surprising gap in the framework of our system of criminal justice. Beyond enforcing the requirements that the grand jurors be so drawn and

impaneled as to be representative of the community from which they come (*State ex rel. Murphy v. Superior Court* (1914), 82 Wash. 284, 144 Pac. 32), and that they be given the opportunity to deliberate in secrecy and in freedom from any compulsion, we find very little control exercised over what goes on in the grand jury room. No case is known in which due process considerations have been applied to the procedures by which a grand jury reaches an indictment.

Judge Learned Hand gives the reason in these words,

"One purpose of the secrecy of the grand jury's doings is to insure against this kind of judicial control. They are the voice of the community accusing its members, and the only protection from such accusation is in the conscience of that tribunal. Therefore, except in sporadic and ill-considered instances, the courts have never taken supervision over what evidence shall come before them, and, with certain not very well-defined exceptions, they remain what the Grand Assize originally was, and what the petit jury has ceased to be, an irresponsible utterance of the community at large, answerable only to the general body of citizens, from whom they come at random, and with whom they are again at once merged. A court shows no punctilious respect for the Constitution in regulating their conduct. We took the institution as we found it in our English inheritance, and he best serves the Constitution who most faithfully follows its historical significance, not he who by a verbal pedantry tries a priori to formulate its limitations and its extent. . . ." *In re Kittle, supra.*

In conclusion, we would emphasize again that the grand jury makes accusations; that it does not determine guilt or innocence. The trial courts then take over, and it becomes the burden of the state to prove the guilt of the person indicted.

Were we in a jurisdiction in which a grand jury was mandatory, we would be compelled to hold that there had been no violation of the defendant's right to a grand jury in the present case. If we assume, *arguendo*, that there are sufficient irregularities in the present case to require such a jurisdiction to quash the indictment, then, since there is no constitutional or statutory right to a grand jury

in this state, we are unable to understand how such irregularities could be of prejudice to the appellant. We find no violation of appellant's constitutional, statutory, or common-law rights in the present grand jury proceedings.

## II. Motions for a Continuance and a Change of Venue.

### A. Continuance:

The indictment was returned by the grand jury on July 12, 1957. The trial began five months, lacking ten days (December 2, 1957), later. The trial had originally been set for October 28, 1957, but was continued for more than a month on the representation that additional time was necessary for the appellant to prepare his defense.

There is no undue haste here, and no claim that there was not adequate time for the preparation of a defense. The appellant wanted further continuances on the ground that the inflammatory publicity concerning appellant had created an atmosphere in which it was impossible for him to obtain a fair trial.

The only statutory ground for a continuance is found in RCW 10.46.080, which has to do with the absence of material evidence, and it has no significance here. We have, however, reviewed orders denying a continuance on grounds similar to those urged here. See *State v. Collins* (1957), 50 Wn. (2d) 740, 743, 314 P. (2d) 660. In the *Collins* case we said that the granting of the requested continuance was discretionary with the trial court. We find no abuse of discretion here.

The appellant tries to apply the *ex post facto* test of the number on the jury panel who admitted prejudice. Appellant fails to make clear that all such prospective jurors were excused, and that thirteen jurors were selected and accepted by both sides within a very reasonable time. All of the fifty-five people who were examined on *voir dire* as prospective jurors had, of course, heard of the case either through television, radio, or the newspapers, but only nineteen were excused for prejudice.

It is the law of this state that the fact that a prospective juror "has formed or expressed an opinion upon what he may have heard or read," shall not disqualify him; and to excuse a prospective juror for "cause"

" . . . the court must be satisfied, from all the circumstances, that the juror cannot disregard such opinion and try the issue impartially." RCW 4.44.190.

As Judge Geraghty said in *State v. Patterson* (1935), 183 Wash. 239, 245, 48 P. (2d) 193,

" . . . It is reasonable to suppose that it was difficult to select a panel of twelve men and women who had not heard or read about the case and formed some opinion or received some impression concerning the event. Under present-day conditions, to select a jury with minds free from some such tentative opinion or impression would be possible only by drawing the panel from hermits or illiterates, and even these would not be isolated from information conveyed by the radio."

In that case, we held that the proper test to be applied to a prospective juror is not whether or not he has an opinion, but whether he can, notwithstanding an opinion, disregard it and render a fair and impartial verdict according to the evidence.

The record of the *voir dire* examination of those called as prospective jurors negates any contention that a continuance was necessary to insure the appellant a fair trial, and justifies the statement of Judge Malcolm Douglas (on November 26, 1957), in denying the motion for a continuance:

" . . . I am not at all impressed with your contention that Dave Beck, Sr., cannot have a fair trial in this community at this time. I believe arguments such as these do poor credit to the intelligence and fairness of the high-calibered jurors that we have in this community, and I am satisfied from observing the trial of cases for many years here and observing the type and quality of jurors that we have had . . . that it is possible to find 12 jurors who can give a defendant, including this defendant, just as fair a trial in December as one could be found to give him in May. . . ."

B. Change of Venue:

The appellant urges that it was prejudicial error to refuse his application for a change of venue to Snohomish or Whatcom county.

The procedure for a change of venue is set forth in RCW 10.25.070, which reads as follows:

"The defendant may show to the court, by affidavit, that he believes he cannot receive a fair trial in the county where the action is pending, owing to the prejudice of the judge, or to excitement or prejudice against the defendant in the county or some part thereof, and may thereupon demand to be tried in another county. The application shall not be granted on the ground of excitement or prejudice other than prejudice of the judge, unless the affidavit of the defendant be supported by other evidence, nor in any case unless the judge is satisfied the ground upon which the application is made does exist."

To conform to the statutory requirement where the motion is based on "excitement or prejudice against the defendant," the affidavit of the defendant must be "supported by other evidence," and such a motion will not be granted "unless the judge is satisfied the ground on which the application is made does exist."

The affidavit of the appellant was not supported by evidence other than newspaper headlines and stories. The affidavit in support of the motion was based on an alleged belief that the hostility and prejudice against him was less extreme and less intense in the counties of Whatcom and Snohomish than it was in King county.

Appellant refers to this as an uncontroverted affidavit. The state could not well controvert what appellant believed.

The only case in which we have reversed a conviction for failure to grant a change of venue was *State v. Hillman* (1906), 42 Wash. 615, 85 Pac. 63. There, the affidavit set forth the content of inflammatory newspaper articles and alleged (p. 618):

" . . . that there was an organization known as the 'Hillman Victim Association,' composed of a large number of people, organized for the purpose of creating public sen-

timent against appellants, and particularly against appellant Hillman, which said association by means of public meetings and individual efforts, and by mailing postal cards reflecting upon the character of said Hillman, had done much to arouse prejudice against these appellants . . . ."

Also the opinion points out that (p. 618),

" . . . There was one affidavit signed by something over thirty residents of King county, wherein the affiants stated that they had read the unfavorable comments in the newspapers, and had heard them discussed by large numbers of people; that said articles and discussion dealt with the innocence or guilt of the defendants, and that the same were most always unfavorable to defendants; that the comments caused by said publications had been so widely spread' that the public mind, in their opinion, was prejudiced to such an extent that a fair trial could not be had in the county; that they had heard of the organization formed for the purpose of harassing said Hillman in the courts, and elsewhere, and that the efforts of said association were reported to be very injurious to said Hillman."

In the *Hillman* case we have allegations of fact, which, if not true, could have been controverted. Here we have only legal conclusions based upon information and belief, not capable of contravention.

Even where the alleged offenses have been accompanied by a great deal of public indignation and prejudice against the accused, the appellate court will not disturb a determination by the trial court that a change of venue should not be granted in the absence of a showing of a manifest abuse of discretion. *State v. Guthrie* (1936), 185 Wash. 464, 56 P. (2d) 160; *State v. Schneider* (1930), 158 Wash. 504, 291 Pac. 1093, 72 A. L. R. 571; *State v. Schafer* (1930), 156 Wash. 240, 286 Pac. 833; *State v. Lindberg* (1923), 125 Wash. 51, 215 Pac. 41; *State v. Wright* (1917), 97 Wash. 304, 166 Pac. 645; *State v. Welty* (1911), 65 Wash. 244, 118 Pac. 9.

In the *Lindberg* case, the accused was a director of a bank which had failed. It had a great many stockholders and many more depositors, and the failure was a matter of great public interest and concern. The court there said (p. 54),

" . . . This affidavit is uncontroverted and contains recitals from which it can be inferred that prejudice to some

extent existed in certain parts of the county against the officers generally of the particular bank, and were the question one on which this court could exercise an independent judgment, we are free to say that it would be permissible to reach a conclusion different from that reached by the trial court. But the question is not one of the first instance in this court. By the express provisions of the statute (Rem. Comp. Stat. §§ 2018, 2019) [P. C. §§ 9397, 9398], the question is vested in the first instance in the discretion of the trial court, and we can review its ruling only for gross abuse. . . ."

The court then used a long quotation from *State v. Welty, supra,* which has been repeated enough times to fill twenty pages of our reports. (We adopt it but do not repeat it.) Our conclusion in the *Lindberg* case was that we found nothing warranting a holding that the trial court grossly abused its discretion, and then said (p. 55),

" . . . The purpose of a change of venue is to secure to the accused a trial before an impartial jury, and if the record does not disclose affirmatively that the accused did not have such a trial, it is very persuasive of the fact that the trial court did not err in denying the change. . . ."

We find, in the present case, no abuse of discretion by the trial court in denying the motion for a change of venue; and this is bolstered by our conclusion, after having studied the entire record, that the defendant did, in fact, have a fair trial.

III. Right to Use of Grand Jury Transcript.

William F. Devin, one of the special deputy prosecuting attorneys before the grand jury, testified concerning certain statements made by the appellant in his testimony before the grand jury. Mr. Devin was testifying not from any document or transcript, but from his recollection of answers given by appellant.

The appellant urges that he was entitled to a transcript of his entire testimony before the grand jury to facilitate his cross-examination of Mr. Devin. He cites no authorities in support of such a proposition. He passes but lightly on the fact that the trial court did make available to appel-

lant's attorneys that portion of appellant's testimony before the grand jury which varied from Mr. Devin's recollection thereof.

A defendant is not entitled, as a matter of right, to a copy of the transcript of his testimony before a grand jury; and the extent to which such a transcript will be made available to him is within the sound discretion of the trial court. *State v. Ingels* (1940), 4 Wn. (2d) 676, 104 P. (2d) 944; *State v. Morrison* (1933), 175 Wash. 656, 27 P. (2d) 1065. This is likewise the rule in the federal courts. *Pittsburgh Plate Glass Co. v. United States* (1959), 360 U. S. 395, 3 L. Ed. (2d) 1323, 79 S. Ct. 1237.

The appellant has cited cases such as *Jencks v. United States* (1957), 353 U. S. 657, 1 L. Ed. (2d) 1103, 77 S. Ct. 1007, and *Powell v. Superior Court* (1957), 48 Cal. (2d) 704, 312 P. (2d) 698, which have to do with the making available to a defendant the written statements by witnesses or confessions of the defendant in the possession of the prosecution.

The United States Supreme Court has recently (June 22, 1959) ruled that the *Jencks* decision does not encompass grand jury minutes. In *Pittsburgh Plate Glass Co. v. United States, supra,* the trial judge refused the defense the right to inspect grand jury testimony of a key government witness. The supreme court held that the determination of such an issue was committed to the sound discretion of the trial judge; and that the defendant was entitled to such a disclosure only where the ends of justice required setting aside the public policy of maintaining the secrecy of the grand jury proceedings. The burden is on the defendant to show a particularized need for it. *United States v. Proctor & Gamble Co.* (1958), 356 U. S. 677, 2 L. Ed. (2d) 1077, 78 S. Ct. 983.

We have recently explored the whole area covered by the *Jencks* case in *State v. Thompson* (1959), 54 Wn. (2d) 100, 338 P. (2d) 319, and concluded that it was a matter in the discretion of the trial court whose action will not be disturbed on appeal unless there is a manifest abuse of that discretion. We are convinced that the trial court prop-

erly exercised its discretion in allowing the defendant only limited access to the transcript of his testimony before the grand jury.

IV. THE PROPRIETY OF THE PROSECUTION'S CONDUCT TOWARD DEFENSE WITNESSES.

The gist of four assignments of error is that the claimed prejudicial conduct of the prosecuting attorney toward appellant and his witness Marcella Guiry entitled him to a new trial. The claim is that in each instance "the prosecution attempted to influence the jury by improper tactics relating to the right against self-incrimination."

We will consider the situations separately. The witness Marcella Guiry was the appellant's secretary. Before the grand jury she had invoked the fifth amendment and declined to testify as to certain matters, but at the trial she did testify as to those matters.

She was asked, on cross-examination, if her answer to certain questions before the grand jury were the same as her answers in court. The appellant's claim was that she either had to say "no," or disclose the fact that she had invoked the fifth amendment, and that either would be prejudicial. She was never placed in that position because an objection was sustained to the question. Appellant urges, however, that the asking of the question was prejudicial error; and relies on *State v. Emmanuel* (1953), 42 Wn. (2d) 1, 253 P. (2d) 386, and *State v. Carr* (1930), 160 Wash. 83, 294 Pac. 1016. These were cases of persistent misconduct and are not applicable here. There was, here, no effort to pursue the matter further after the objection was sustained.

In such a situation as this, the judgment of the trial court in passing upon the motion for a new trial must be accorded great weight. The trial judge is able to observe any reaction of the jurors unfavorable to appellant by reason of misconduct of counsel, and is in a much better position than is this court to determine whether it has been prejudicial. *Discargar v. Seattle* (1948), 30 Wn. (2d) 461, 191 P. (2d) 870; *State v. Van Luven* (1945), 24 Wn. (2d) 241, 163 P. (2d)

600; *O'Neil v. Crampton* (1943), 18 Wn. (2d) 579; 140 P. (2d) 308; *Marlowe v. Patrick* (1935), 181 Wash. 647, 44 P. (2d) 776. The trial court did not see any prejudicial misconduct in the asking of the question to which an objection was sustained; and we find no abuse of discretion in his refusal to grant a new trial in consequence of the claimed misconduct.

We turn now to the appellant's contention, regarding his own examination. When he took the stand, he limited his testimony rather rigidly to matters concerning his official position with various labor organizations, such as the International Brotherhood of Teamsters, the Western Conference of Teamsters, and the Joint Council of Teamsters; the location of his offices in Washington, D. C., and Seattle; his employment of the accountancy firm of Friedman, Lobe & Block for his personal financial books and records. He did not testify with respect to the transaction, which was the basis of the indictment.

No objection was made during the appellant's cross-examination, except that the matter inquired about was immaterial, irrelevant, and beyond the scope of the direct examination. (There is one exception concerning which we will make special reference.)

He testified, over objection, that Mrs. Marcella Guiry took care of his books so far as the B & B Investment Company was concerned; that he could not identify her handwriting on certain exhibits; that certain accounts seemed to be in connection with his business; that there was a sale of property with Callahan, but he did not recall the details; that he authorized the sale of a Cadillac, and the amount received was nineteen hundred dollars; that the money was deposited in the B & B Investment Company account.

All of which was entirely consistent with the appellant's theory of the case.

Objections were sustained to questions as to whether he drove the 1952 Cadillac; when the final payment was made on the sale of the Beck-Callahan property; and whether appellant was in town when the proceeds of the sale were deposited in the B & B Investment Company account.

When the question of "who sold the car, do you know?" was asked, counsel for appellant asked that the jury be excused, and stated to the court in the absence of the jury,

"That question being outside the scope of the direct examination and having been asked by Counsel, and since it is in effect a comment on the defendant's failure to testify with respect to the car and violates his constitutional rights, I move for a mistrial."

The motion was denied, and the objection sustained on the ground that it went beyond the scope of the direct examination.

Appellant urges that the rule is that the cross-examination of a defendant who takes the stand is limited to subjects to which the defendant testified, and that examination beyond the scope of the direct examination, in such cases, constitutes a violation of the defendant's right against self incrimination.

When a defendant takes the stand in his own behalf he is subject to the same rules on cross-examination as other witnesses. *State v. Putzell* (1952), 40 Wn. (2d) 174, 242 P. (2d) 180; *State v. Jeane* (1950), 35 Wn. (2d) 423, 213 P. (2d) 633; *State v. Ternan* (1949), 32 Wn. (2d) 584, 203 P. (2d) 342; and, if he opens up a subject on direct examination, he can be cross-examined thereon. *State v. Johnson* (1935), 180 Wash. 401, 40 P. (2d) 159; *State v. DeGaston* (1940), 5 Wn. (2d) 73, 104 P. (2d) 756.

The latitude to be allowed on cross-examination is within the sound discretion of the trial court. *State v. Schneider, supra; State v. Jeane, supra.* The trial court adequately protected the appellant.

The appellant is urging, as in the case of Mrs. Guiry, that, even though objections were sustained, the asking of the questions in itself constituted prejudicial error.

Appellant again relies on *State v. Emmanuel, supra*, together with *State v. Carr, supra*; but the circumstances which warranted reversal in those cases are readily distinguishable from those with which we are here concerned.

We fail to find any indication that appellant's right against

self-incrimination was violated, or that the court abused its discretion in its handling of his cross-examination.

### V. Admission of State's Exhibits Nos. 17 and 18.

The issues raised by the appellant's objections to state's exhibits Nos. 17 and 18 must be examined against the background of the circumstances, and the position of the state and the appellant with reference to them.

It is not disputed that the nineteen hundred dollars, which the appellant is charged with having embezzled, was deposited February 3, 1956, in a bank acount of which he was the sole owner, the account being in the name of the "B & B Investment Co."

How this nineteen-hundred-dollar item was entered in the records of the "B & B Investment Co." became the subject of controversy. The state insisted that the nineteen-hundred-dollar item was entered in the "B & B Investment Co." records as the proceeds of the sale of Beck-Callahan property. This would support an inference of an intention to conceal the real source of the nineteen hundred dollars.

It is conceded that the "B & B Investment Co." was disposing of real property known as the Beck-Callahan property, and $16,900 had been received by the "B & B Investment Co." from that source in January of 1956.

The state's evidence in support of its position was exhibit No. 17, a photostatic copy of a work sheet prepared in March, 1957, by Carl E. Houston, an accountant employed by the accounting firm which was preparing the appellant's 1956 income tax return. Taking his information from the "B & B Investment Co." ledger sheet or journal (a loose-leaf record), he entered on his work sheet under "Sales of real estate and other assets Beck/Callahan $16,900.00," as part of the January, 1956, receipts and "Beck/Callahan $19,000.00," as part of the February receipts. He discovered his error as to the latter amount, and changed it to $1,900.00.

The defense was urging that Houston had made a mistake, and that the actual entry in the "B & B Investment Co." ledger sheet or journal for February, 1956, was "Sale Cadillac Auto $1,900.00," as shown by defendant's exhibit No.

22, which the defense claimed to be the ledger sheet or journal from which Houston secured his information.

If Houston did make a mistake, it was not discovered until after he had testified before the grand jury, and his work sheet had been before that body and had been photostated. State's exhibit No. 17 was the photostatic copy of that work sheet. The actual work sheet remained in the possession of the accounting firm until produced at the trial. At that time it appeared that the nineteen hundred dollar item had been moved from "Sales of real estate and other assets Beck/Callahan" to a new heading of "Sale of Auto." With this change, the original work sheet was admitted as state's exhibit No. 18.

Houston testified that it was as a result of the grand jury investigation that the accountants first discovered that the nineteen hundred dollar item came from the sale of an automobile. After his testimony before the grand jury, he did not again examine the "B & B Investment Co." ledger sheet or journal until in August or September, 1957. On his reexamination he found the entry "Sale Cadillac Auto $1,900.00," as shown in defendant's exhibit No. 22, and then made the change, to which we have referred, on state's exhibit No. 18.

One can believe that Houston made a mistake in March, 1957, and that exhibit No. 22 is the original and only ledger sheet or journal; or he can believe that Houston copied correctly what he saw in March, 1957, and that Marcella Guiry prepared a new ledger or journal sheet and substituted it for the original after the grand jury investigation and before the trial. All entries on exhibit No. 22 are in her handwriting, and such a substitution would have been possible.

It must be remembered that the ledger sheet or journal of the "B & B Investment Co." was a part of the books and records of the appellant, which the state could not subpoena or demand that he produce for the reason that it was beyond the power of the court to enforce the demand. *State v. Morden* (1915), 87 Wash. 465, 151 Pac. 832; *State v. McCauley* (1897), 17 Wash. 88, 49 Pac. 221. To make such a demand in the presence of the jury would be error warranting a

reversal. *State v. Jackson* (1915), 83 Wash. 514, 145 Pac. 470.

We are satisfied that the state's exhibits Nos. 17 and 18 were admissible as secondary evidence, and the best available to the state of what the appellant's records showed as to the source of the nineteen hundred dollars. *Hartzog v. United States* (1954), (4th C. A.) 217 F. (2d) 706; *Lisansky v. United States* (1929), (4th C. A.) 31 F. (2d) 846, 67 A. L. R. 67. Its weight was for the jury.

The defense urged that when it offered the ledger or journal sheet (defendant's exhibit No. 22), it was the best evidence, and secondary evidence was not admissible. That, of course, assumed the authenticity of exhibit No. 22. The state was not bound by, nor was the jury obliged to believe, Mrs. Guiry's testimony that she had made the entry "Sale Cadillac Auto $1,900.00" in the first part of March, 1956; and that she had not seen the ledger or journal sheet in question since March, 1957, until she saw it in the court room. *Unosawa v. Wright* (1954), 44 Wn. (2d) 777, 270 P. (2d) 975.

Neither does Houston's present opinion, that he made a mistake (based as it is on his assumption of the authenticity of exhibit No. 22), nullify the inference to be drawn from his original entry on his work sheet, which he believed to be correct at that time.

All of the evidence by both sides on the issue of how this nineteen hundred dollar item had been carried in the appellant's records was before the jury. Whether or not Houston's original entry on his work sheet was a correct one, or was an error, was for the jury. *Burrill v. S. N. Wilcox Lbr. Co.* (1887), 65 Mich. 571, 32 N. W. 824.

VI. SEPARATION OF THE JURY.

The defendant invoked RCW 10.49.110, prohibiting the separation of jurors. He argues that the jurors were permitted to separate, and that prejudice to the defendant is conclusively presumed therefrom.

The specific instances referred to in plaintiff's brief are four:

1.  Juror No. 3 was observed talking with two nonjurors, a woman and an elderly man.

2.  Juror Eleanor Eaken conversed with her husband.

3.  On one visit by her husband to juror Eleanor Eaken, he was accompanied by their son.

4.  Juror Frank Walton conversed with his wife.

In every instance, the claimed separation was no more than a communication with a nonjuror (wife, husband, or son of the juror) relative to family matters or the needs of the juror; it was, in each instance, in the presence of a bailiff, and there was no physical separation from the other jurors.

In our earlier decisions we placed a very narrow meaning on the word "separation." In *State v. Morden, supra,* the state and the defendant had agreed that over a weekend the jurors in the charge of the bailiffs, might attend a church service and go to a theatre. On Sunday afternoon, eleven jurors, with one of the bailiffs, went to see a movie. The other juror, having (p. 475)

" . . . conscientious scruples against attending places of amusement on Sunday, remained outside within the portico or porch of the theater building during that period.
. . .

"Affidavits of the juror and bailiff who remained outside the theater were produced to the effect that, during the period of separation, they had no conversation with any one. . . ."

We held that this was a separation within the purview of the statute.

By 1918, we were questioning that interpretation; and in *State v. Harris* (1918), 99 Wash. 475, 477, 169 Pac. 971, we said,

" . . . The statute making women eligible to jury service of itself necessitated, and was of itself, a change in the existing system relating to the separation of juries. In trials protracted over considerable periods of time, the rules of society, propriety, and common decency require that mixed juries be allowed to separate according to sexes at stated intervals during its progress.

"It may be questioned, moreover, whether the courts have not placed a too narrow construction on the word 'separate'

as used in the statutes. The object and purpose of keeping them sequestered is, and has always been, to keep them from being influenced with reference to the matters given them in charge, by ulterior practices. This purpose is as well accomplished when the jury are kept singly under the charge of sworn officers of the court as it is when they are kept under like officers in a body."

Later decisions have further deviated from the strict interpretation of the *Morden* case, and have permitted the physical separation of jurors in the custody of bailiffs, or under circumstances where no possible prejudice could result. *State v. Hunter* (1935), 183 Wash. 143, 48 P. (2d) 262; *State v. Stratton* (1933), 172 Wash. 378, 20 P. (2d) 596.

While conversations, such as occurred in this case at the open door of the jury dormitory and on one occasion on the street near the court house door as the jurors were going to dinner, should be avoided, they do not constitute a separation of the jury, but, rather, "Communication with or by jurors." It was so categorized in *State v. Rose* (1953), 43 Wn. (2d) 553, 262 P. (2d) 194, where jury misconduct was discussed under three categories: (a) Entry of jury room by unauthorized person with a document for a juror; (b) Communications with or by jurors; (c) Separation of jury.

But, giving the appellant the benefit of the more rigid rules and the *prima facie* presumption of prejudice that follows upon a separation or upon a communication between a juror and a nonjuror, the burden is on the state to show that no prejudice actually resulted. *State v. Rose, supra*; *State v. Smith* (1953), 43 Wn. (2d) 307, 261 P. (2d) 109; *State v. Amundsen* (1950), 37 Wn. (2d) 356, 223 P. (2d) 1067, 21 A. L. R. (2d) 1082.

Here, the state did sustain that burden and established that every conversation between a juror and a nonjuror was in the presence of a bailiff, and that the subject matters of the conversations could not have been in any way prejudicial to the appellant. Under such circumstances, we will not disturb the order of the trial court in refusing to grant a new trial. *State v. Smith, supra*; *State v. Carroll* (1922), 119 Wash. 623, 206 Pac. 563; *State v. White* (1920), 113 Wash. 416, 194 Pac. 390.

VII. Deprivation of a Peremptory Challenge.

Appellant urges that Raymond Kraatz, contrary to his testimony on *voir dire*, was actually hostile to the Teamsters Union. The appellant was forced to use a peremptory challenge to keep Kraatz off of the jury.

Evidence of the prospective juror's claimed duplicity was brought to the attention of the trial court for the first time in the motion for a new trial. It is the appellant's contention that had the juror's true attitude been known to the court during the *voir dire* examination of Kraatz, he would have been excused for cause; and appellant would have thus been saved a peremptory challenge.

The purpose of the *voir dire* examination is to enable the parties to learn the state of mind of the prospective juror, and to demonstrate, if possible, that the prospective juror is subject to a challenge for cause. The appellant does not contend that any basis was developed for a challenge for cause in the examination of Kraatz.

Had Kraatz served on the jury, and had it developed that the appellant had been deceived by his false answers to questions on *voir dire*, an entirely different question would be presented; but, even were that the claimed situation, the bias of the juror would have to be established by something more reliable than hearsay affidavits. *Casey v. Williams* (1955), 47 Wn. (2d) 255, 287 P. (2d) 343; *State v. Maxfield* (1955), 46 Wn. (2d) 822, 285 P. (2d) 887; *State v. Patterson, supra; State v. Dalton* (1930), 158 Wash. 144, 290 Pac. 989; *State v. Simmons* (1909), 52 Wash. 132, 100 Pac. 269; *State v. Wilson* (1906), 42 Wash. 56, 84 Pac. 409.

Here, Kraatz did not deceive the appellant; he was, in fact, excused. That, after all, is what peremptory challenges are for. The purpose of such challenges is to get off of the jury the person whose bias a party knows or suspects but can't establish on his *voir dire* examination. If we assume the bias of Kraatz, it would be a new development in the field of criminal law to hold that a defendant, who had used all of his peremptory challenges, was entitled to a new trial if he could show, at some time before the motion for a new

trial was argued, that one of the prospective jurors (excused by a peremptory challenge) had an actual bias.

Appellant has presented no authority for such a holding, and we are satisfied there is none.

VIII. THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.

The statute under which this prosecution is brought is as follows:

"Every person who, with intent to deprive or defraud the owner thereof—

" . . .

" (3) Having any property in his possession, custody or control, as bailee, . . . agent, . . . trustee, . . . or officer of any . . . association or corporation, . . . shall secrete, withhold or appropriate the same to his own use . . .

" . . .

"Steals such property and shall be guilty of larceny." RCW 9.54.010.

It is appellant's contention that, at most, the state's case showed receipt by him of the nineteen hundred dollars from the sale of the car, and a failure to account therefor; and, since the intent to appropriate the money and deprive the owner of it was not established, there was not sufficient evidence to prove embezzlement.

A similar contention was made in *State v. Campbell* (1918), 99 Wash. 502, 169 Pac. 968, where the prosecution was under the same statute. A syllabus in that case states the facts and applicable rule concisely:

" . . . In a prosecution for the embezzlement of the proceeds of a note and mortgage delivered to the accused for the purpose of collection, intent to deprive the owner of the property is sufficiently established by the fact that accused sold the note and mortgage to a third person and converted the proceeds to his own use."

The following quotation from the opinion amplifies the reasoning summarized in the syllabus (pp. 504, 505):

"It is next urged that there was no direct and specific evidence tending to prove an intent on the part of appellant to deprive Mrs. Fuchs of her property. No instrument has yet been invented by means of which the inner workings

of the human mind may be revealed; hence criminal intent, in the vast majority of cases, is not capable of direct and positive proof. In the absence of an express declaration thereof, a criminal purpose can only be established as an inference from action and conduct—the external manifestations of design. Since, in embezzlement, the necessary effect of the wrongful conversion is to deprive the owner of his property, the act of appropriation gives rise to the inference that the perpetrator intended the inevitable result of his conduct. In this case, the intent to defraud was evidenced by the act of the appellant in selling the note and mortgage to a third person and converting the proceeds to his own use or to the use of Colin Campbell Security Company, instead of faithfully executing his trust by collecting the amount secured by the mortgage and accounting therefor to Mrs. Fuchs. . . ."

A stronger case for the appellant-defendant was made in *State v. Jakubowski* (1913), 77 Wash. 78, 87, 137 Pac. 448, where we said,

". . . In our statement of the case, we have detailed every salient feature of the evidence, and while it appears to this court as persuasively negativing a criminal intention on the appellant's part, its weight and the credibility of the appellant and his witnesses were for the jury. As we have seen, there was adduced by the state competent evidence tending to prove every element of the crime as charged. The trial court denied the appellant's motion in arrest of judgment and refused to grant a new trial upon conflicting evidence. In such a case, whatever our own opinion as to the weight or preponderance of the evidence, we cannot reverse the action of both the trial court and the jury. To do so would be to invade the province of both. It would be to substitute our judgment for that of the jury as to a question of fact upon conflicting evidence, and our discretion for that reposed by statute in the trial court.

" 'This court has heretofore announced that it will not disturb verdicts of this character, on the ground of alleged insufficiency of evidence, where there is evidence to support the verdict, although it may not be of the most convincing kind. Both the jury and the trial court have the opportunity to hear and see the several witnesses, to note their manner as to apparent candor and truthfulness, and are therefore better prepared to pass upon the credibility of their testimony than is this court with only a bare record of the words spoken by the witnesses. The weight of the evidence having

been first passed upon by the jury, and next by the trial judge in denying the motion for new trial, we shall not undertake to say that they were wrong.' *State v. Ripley,* 32 Wash. 182, 72 Pac. 1036."

See, also, *State v. Dudman* (1922), 119 Wash. 522, 205 Pac. 848.

The court instructed the jury (and no error has been assigned to the instruction):

"I instruct you that the intent to deprive or defraud, which is one of the elements of the offense of grand larceny, as charged in the Indictment in this case, must be proved by competent evidence beyond a reasonable doubt. However, it need not be proved by direct and positive evidence, but the existence of such intent may be inferred from the acts of the parties and the facts and circumstances surrounding them." Instruction No. 5.

It is unnecessary to again review the evidence in this case, nor is it our responsibility to weigh it. There was no doubt in the mind of the trial court, nor is their in ours, that the jury was entitled to infer the intent to deprive the Western Conference of Teamsters of the nineteen hundred dollars from the acts (which includes failure to act) of the appellant.

The evidence shows that the appellant knew as early as February, 1956, that the nineteen hundred dollars had been deposited in his bank account; that more than a year later it had not been paid over to the owner. The only semblance of an explanation came in the state's case, through the testimony of William F. Devin, as to statements made by the appellant before the grand jury, *i.e.,* that not knowing to whom the car belonged, he had given nineteen hundred dollars in cash to Fred Verschueren, Jr., with instructions to apply it to the proper account. The jury was not obligated to believe that explanation.

The appellant was clearly confronted with a *prima facie* case, and the defense presented did no more than suggest possibilities of what appellant might have done or might have intended to do with the nineteen hundred dollars, by way of explanation of why it had not been paid over to its rightful owner.

There is no merit in the assignments of error raising the issue of the insufficiency of the evidence to sustain the verdict.

IX. MISCONDUCT OF THE DEPUTY PROSECUTING ATTORNEY IN ARGUMENT TO THE JURY.

Two statements made by the deputy prosecuting attorney, in the course of rebuttal argument, are urged as error.

The one of which appellant makes the most bitter complaint is (p. 1332),

"But now we get down to the point where everything is deadly serious. You have a tremendous responsibility. Counsel refers to all of this terrible publicity. It is true. The eyes of the entire world probably are upon you right now and the evidence that has been presented here against this defendant has been widespread. There is no question about that. You should return a proper verdict, that is your responsibility. You are the ones that are going to have to look at yourselves the rest of your lives. You are the ones that are going to have to be with your neighbors and friends and hold your head up high and say, 'I did what my heart and mind told me.' You are not to be influenced at all by any sympathy or prejudice. Nothing at all can be considered by you except the evidence from this witness stand."

The appellant says that the purpose of that statement was to remind the jury of the great amount of adverse publicity against him, and to remind them that they ought to take into account the public clamor and its desire that the appellant be convicted; and, further, to remind them that if they returned a verdict of not guilty, they would be held up to public disfavor and ridicule.

We do not so interpret the statement by the deputy prosecuting attorney. Comment on the matter of publicity was invited by the emphasis that appellant's counsel placed on it in his argument in such statements as (p. 1266),

". . . the rumors and the gossip and the frenzied, insane propaganda that could have been created only by somebody with the insanity of a Goebels. . . ."

and,

". . . the tremendous amount of unfavorable publicity that has been circulated about Mr. Beck, almost to

the point of saturation of the public press and the radio and the newspapers, repeated and repeated and repeated; the Nazi system."

Even in the portion of the argument objected to, the deputy prosecuting attorney tells the jury,

" . . . You are not to be influenced at all by any sympathy or prejudice. Nothing at all can be considered by you except the evidence from this witness stand."

The other statement of the deputy prosecuting attorney, concerning which complaint is made, has to be placed in context to be understood.

Appellant's counsel had been at some pains to explain to the jury why he did not call Fred Verschueren, Jr., as a witness. (Verschueren, Jr. was the person to whom appellant supposedly had given the nineteen hundred dollars to turn over to the owner of the 1952 Cadillac.) Commenting on counsel's explanation, the deputy prosecuting attorney said (p. 1316),

"He tells us that he wants to protect Mr. Verschueren, Jr. Mr. Verschueren, Jr., you will recall, testified before the grand jury. There was testimony to that effect here. *Mr. Beck testified before the grand jury and the grand jury wasn't made up of four ogres who were breathing down the neck of anybody. It was made up of seventeen people just like you, seventeen citizens selected to sit on that grand jury and seventeen people after they heard the testimony of Mr. Regal and Mr. Verschueren, Jr. returned an indictment and that is what you are trying here today.*

"Now the question is, in Mr. Burdell's strategy, should he take Mr. Beck and put him on the stand and have him explain this which he didn't do and could he bring Mr. Verschueren, Jr. in to have'him explain this which he didn't do, because he felt most likely, we can assume he felt this way, if I do that, I really am sunk, so what I have to do is to try to talk the jury into assuming things from these little bits of evidence that I can bring in with witnesses of some stature in the community." (This is taken from the statement of facts. Italics are ours.)

Appellant complains of the italicized portion. (As quoted in appellant's brief, Mr. Regal is changed to Mr. Beck in the next to the last line of the italicized portion; and we

will assume, for present purposes, the change to be correct.) Appellant urges that the italicized portion of the argument throws the weight and prestige of the grand jury into the scale against him. Read in context, as an answer to the appellant's explanation for not calling Fred Verschueren, Jr. as a witness, it is a proper response. We have consistently held statements of a prosecuting attorney, which would ordinarily be improper, will not be regarded as prejudicial error where they are in answer to and are invited by the argument made by defense counsel. *State v. Collins, supra; State v. Taylor* (1955), 47 Wn. (2d) 213, 287 P. (2d) 298; *State v. Harold* (1954), 45 Wn. (2d) 505, 275 P. (2d) 895; *State v. Van Luven, supra; State v. Wright, supra.*

Appellant does not argue, under this division of his brief, his other claim of misconduct of counsel: that the prosecutor, by an illustration used in argument (*i.e.*, that one who stole a bracelet before a court room full of people was entitled to the presumption of innocence if he went to trial), destroyed any effect of the presumption of innocence, and thereby denied him the benefit of that presumption.

We do not agree. Prosecutors have been using similar illustrations for many years, but it has never before been urged as a denial of due process.

Appellant argues this in his division X, but we have placed it with other claimed misconduct of counsel.

X. INSTRUCTIONS GIVEN AND REFUSED:

Up to this point, we have accepted, in substance, the headings which the appellant has given to the divisions in his brief. Appellant's heading for division X, however, is, in effect, DENIAL OF DUE PROCESS. He reargues briefly the errors already urged with reference to the grand jury proceeding, and asserts that the accumulative effect of the many errors constitutes a denial of due process. Having found no prejudicial error in divisions I to IX, we are not impressed with their cumulative effect.

We will, therefore, cover only the matters not heretofore urged. Appellant assigned error to instructions Nos. 2, 3, 14, and 16, but argues only as to Nos. 3 and 16. Appellant

assigned errors to the failure to give his requested instructions Nos. 10, 14, and 38.

It is urged that the trial court should not have given instruction No. 3, because it merely emphasized the most favorable aspects for the state—already adequately stated in instruction No. 2.

Instruction No. 2 was the comprehensive statement of all of the elements of the offense which the state must prove before the jury could convict.

Instruction No. 3 is a definition of the crime of grand larceny by embezzlement, substantially in the words of the statute. RCW 9.54.010(3); RCW 9.54.090(6).

Under the facts of this case it was not error to instruct in the language of the statute. *State v. Sedam* (1955), 46 Wn. (2d) 725, 284 P. (2d) 292; *State v. Bixby* (1947), 27 Wn. (2d) 144, 168, 177 P. (2d) 689; *State v. Verbon* (1932), 167 Wash. 140, 8 P. (2d) 1083.

Appellant points out no error in instruction No. 16 on presumption of innocence and reasonable doubt, but urges that his instruction No. 10 on that subject was preferable, particularly in view of the argument of the deputy prosecutor on the presumption of innocence. (The trial court had no way of knowing when the instructions were given what the deputy prosecutor's argument would be.)

The trial court's instruction was a proper statement of the law, and seems preferable to us to the much longer and more argumentive instruction proposed by the appellant. It certainly was not error to refuse a requested instruction where the principle of law stated therein was adequately covered by the instruction given. *State v. Myers* (1959), 53 Wn. (2d) 446, 334 P. (2d) 536, and numerous cases therein cited.

It is urged that, since the trial court gave instruction No. 3 (the statutory definition of grand larceny by embezzlement), it should have given appellant's proposed instruction No. 14 to the effect that the defendant could not be guilty unless there was a "definite intent to take the proceeds [of the sale of the Cadillac] from the Western Conference of Teamsters and deprive it of the money."

The element of intent was stated in instruction No. 2, and emphasized and re-emphasized in instructions Nos. 5, 7, and 9.

The jury was more than adequately instructed on the necessity of intent, and the trial court did not err in refusing to give appellant's proposed instruction No. 14. *State v. Myers, supra.*

Appellant's proposed instruction No. 38, after stating the presumption of innocence, said,

"This must especially be kept in mind when any person has received unfavorable nation-wide publicity in non-judicial proceedings which have the tendency to be one-sided because the party involved has no opportunity to make any adequate defense."

In his brief, appellant says,

"Finally, the failure of the court to grant appellant's instruction No. 38 . . . was certainly error in view of the fact no other instruction of the court told the jury to disregard the unprecedented publicity."

No authority is cited, and there is no argument beyond the statement quoted from the brief. One could not refer to this as a slanted instruction, because it is practically perpendicular. There was no evidence in the case to which the instruction applied. The matter of unprecedented publicity was, as we have seen, injected into the case by appellant's counsel in argument to the jury. The trial court properly refused to give such an instruction. *State v. Hart* (1946), 26 Wn. (2d) 776, 175 P. (2d) 944; *State v. Powell* (1927), 142 Wash. 463, 253 Pac. 645.

The length of the record (2,400 pages), and the number and novelty of many of the issues raised on the appeal, has unduly delayed the determination of this nineteen hundred dollar grand-larceny-by-embezzlement case.

We find ample evidence to sustain the verdict and no prejudicial error in the record. The judgment appealed from should be affirmed.

WEAVER, C. J., MALLERY, and OTT, JJ., concur.

DONWORTH, J. (dissenting)—In my opinion, the majority,

in upholding appellant's indictment, has reached a result which is directly contrary to the settled policy of this state as determined by our legislature with respect to the impaneling of grand juries. Therefore, I cannot agree with the majority holding that appellant was not entitled, *under the laws of this state,* to have a grand jury composed of impartial and unprejudiced jurors.

In considering appellant's motion to quash the indictment, we must bear in mind that appellant was indicted by a grand jury impaneled in the state of Washington and not by a Federal grand jury or a grand jury of a state whose statutes differ from ours. However, the majority holds that the superior court need not inquire whether the prospective grand jurors entertain any prejudice against the person whose conduct the court, in its charge, directs them to investigate, and bases its holding upon decisions of the Federal courts whose grand juries need not be composed of impartial and unprejudiced jurors because no statute or rule of court so prescribes.

To fully understand the very serious problem presented by the three assignments of error quoted below, it is necessary to consider certain material facts shown by the record, which are not referred to in the majority opinion, presumably because of its view that everything that happened prior to the trial of the case is immaterial. In order to properly consider the legal question which is presented, I consider it necessary to state these facts in some detail before coming to a discussion of the applicable statutes and decisions of this court.

The assignments of error with which we are first concerned are as follows:

"25. The court denied appellant's rights to a fair and impartial grand jury.

"26. The court erred in prejudicing the grand jury against appellant by its charge.

"28. The court erred in failing to set aside the indictment for misconduct of the prosecutor before the grand jury."

In passing upon the merits of these assignments, we should have in mind the unique situation which existed during the

three months immediately preceding the convening of the grand jury.

The grand jury, which returned the indictment herein, was convened on May 20, 1957. Several months prior thereto, the Senate Select Committee on Improper Activities in the Labor-Management Field (commonly referred to as the Senate Rackets Investigating Committee) commenced an investigation of certain labor unions and their officers. Needless to say, these hearings were not of a judicial nature. Ordinary rules of evidence were not applicable, nor were the witnesses subject to cross-examination. The stated object of the committee hearing was to obtain information which would aid Congress in enacting legislation bearing upon labor-management relations.

Most of the hearings were conducted in public and were widely reported by the various news media. During the period of approximately three months prior to the impanelment of the grand jury, appellant was the principal subject of charges of misconduct made in the course of the hearings. Because appellant was then, and since childhood had been, a resident of Seattle, and for the preceding thirty years had been a labor leader of national reputation,[2] this area was the focal point for the dissemination of the highly derogatory publicity concerning appellant which resulted from the committee hearings. The local press featured front-page headlines in large, heavy type, in which the more sensational excerpts from that day's testimony or other proceedings of the committee were flamboyantly displayed. The local radio and television stations carried the same material, and in several instances both media reported the hearings "live" from Washington, D. C.[3]

---

[2]Prior to December, 1952, appellant was for many years president of the Western Conference of Teamsters, which covered eleven western states. He maintained his office in Seattle. In December, 1952, appellant became president of the International Brotherhood of Teamsters (a labor union having one and one half million members), which maintained its principal office in Washington, D. C. Thereafter, appellant continued to maintain an office in Seattle and held the official title of president emeritus of the Western Conference.

[3]An advertisement by a local television station appeared in the newspaper stating that it would report the proceedings of the Senate

510

On March 26, 1957, and again on the following day, appellant, accompanied by counsel, appeared as a witness before the committee. Upon the advice of counsel, appellant informed the committee that he would assert the privilege against self-incrimination guaranteed him by the Fifth Amendment to the United States Constitution because of the fact that he was currently being investigated for possible violations of Federal law. The committee posed questions to appellant which he refused to answer (on the advice of counsel) on the ground that an answer might tend to incriminate him. He did so a total of one hundred fifty times during the two days of his interrogation by the committee.

On May 2, 1957, appellant was indicted in Tacoma by a Federal grand jury for alleged income-tax evasion.

On May 3, 1957, there appeared on the first page of the Seattle Post-Intelligencer a statement to the effect that the prosecuting attorney had decided to name special prosecutors to assist him in conducting the grand jury proceedings. This article contained the following statement:

"The grand jury is to investigate possible misuse of Teamsters Union funds by international president Dave Beck . . ."

On May 8, 1957, appellant was recalled to testify before the Senate Committee, where he was again subjected to a lengthy interrogation, during which appellant again invoked the Fifth Amendment, upon the advice of counsel, approximately sixty times.

During the course of these proceedings, the committee chairman, its counsel, and some of its members, orally stated certain conclusions and expressed opinions regarding the conduct of appellant. These comments, which were extremely derogatory to appellant, were widely circulated by all news media throughout the United States, and particularly in the Seattle area. In these comments, appellant was

Committee regarding appellant exclusively "live" on Wednesday, March 27, 1957. The advertisement showed the station was going to devote approximately 9-3/4 hours of that day's programming to both reproductions of the Senate hearings and news comments thereon.

characterized as a thief, and it was asserted that he was guilty of fraud and other illegal conduct with respect to his management of the affairs of the teamsters' union as its principal officer in the eleven western states, and later in his position as its international president.

These conclusions and opinions (particularly those expressed by Senator McClellan, the chairman of the committee) were displayed by local newspapers on the front page in prominent headlines. The following are a few of the comments which were referred to in such headlines which appeared in Seattle newspapers:

"TEAMSTERS' CASH KEPT GOING TO BECK AFTER HE BECAME UNION PRESIDENT, SAYS PROBER." Seattle Times, March 23, 1957.

"BECK'S USE OF $85,000 MAY BE THEFT, SAYS MCCLELLAN." Seattle Times, March 27, 1957.

"BECK GIVES 'BLACK EYE' TO LABOR, SAYS SEN. MCNAMARA." Seattle Times, March 27, 1957.

"SENATE PROBE LIFTS LID ON BECK BEER BUSINESS—USE OF UNION MONEY RELATED." Seattle Post-Intelligencer, May 9, 1957.

Substantial portions of the committee proceedings relating to these charges were also reproduced in the course of news broadcasts on local radio and television stations.

The amount, intensity, and derogatory nature of the publicity received by appellant during this period is without precedent in the state of Washington. A Seattle newspaper carried a news item reporting that the switchboard of a local radio station that had broadcast the committee proceedings on the preceding day was jammed with calls, and that the officials of the station characterized the response to the broadcast on the part of the public as "astounding," and that such response was greater than that resulting from any other broadcast ever aired by them. The serious accusations made by United States senators in the committee hearings are generally regarded by laymen as being official charges (which appellant had refused to answer)[4], and thus

---

[4]Appellant, in so doing, was exercising a right guaranteed him by the United States Constitution. See *Hoffman v. United States*, 341 U. S. 479, 95 L. Ed. 1118, 71 S. Ct. 814.

the impression was created among the general public that appellant had been found guilty of a crime. The natural effect of this publicity was that, in the eyes of the average citizen, the character of appellant had been thoroughly discredited in the Seattle area on or before May 20, 1957.

In view of the circumstances shown by the undisputed facts stated in the affidavits in this case, I think it would be unrealistic to believe that a very substantial number of the citizens of the community had not adopted, consciously or unconsciously, an attitude of bias and prejudice toward appellant at the time the grand jury was convened. If ever there was a case which required the most stringent observance of every safeguard known to the law to protect a citizen against bias and prejudice, this was it.

On July 30, 1957, appellant (who had been indicted on July 12th) filed a motion to allow him to publish and inspect a transcript of both the grand jury *voir dire* and the grand jury proceedings. Appellant filed an amended motion on September 16, 1957, supported by his counsel's affidavit, stating on information and belief that the grand jury was prejudiced and biased. On September 20, 1957, the trial court entered an order granting appellant the right to publish and inspect the open court proceedings of the grand jury (*i.e.* the *voir dire* and the court's charge).

On October 18, 1957, appellant filed, along with other pretrial motions not pertinent hereto, a motion to set aside and dismiss the indictment. This motion was accompanied by his counsel's affidavit, attached to which was a compilation of photostatic copies of newspaper and magazine articles (total 139 pages) showing the nature and extent of the adverse publicity concerning appellant. On the same day, appellant also filed a challenge to the grand jury upon the grounds

" . . . that the court which impaneled said grand jury made no determination as to whether a state of mind existed on the part of any juror such as would render him unable to act impartially and without prejudice."

All of these motions were argued before the superior court on November 4, 1957, and on November 7, 1957, the court

entered an order denying both the motion to set aside and dismiss the indictment and the challenge to the grand jury, but directing that the testimony of Fred Verschueren, Jr., before the grand jury be transcribed, sealed, and retained in the case file, subject to disclosure only in the event of a conviction and subsequent appeal. The state's application to this court for a writ of prohibition to prevent the entry of this order was denied.

In considering the three assignments of error referred to above, I shall discuss (1) the impanelment of the grand jury, (2) the charge given the grand jury, and (3) the alleged misconduct of the prosecuting officers in the examination of a witness before the grand jury.

### THE IMPANELMENT

Within five days before the prospective members of the grand jury reported to the court, the Seattle newspapers published articles with these headlines:

"BECK APPARENTLY STOLE $300,000 FROM UNION, SAYS PROBE AIDE." Underneath this headline is the following statement:

"Labor Probe at a Glance:

"Robert Kennedy, counsel for the Senate Rackets—Investigating Committee, said it would appear that $300,000 to $400,000 which Dave Beck 'borrowed' from the Teamsters actually was 'stolen.' (See below.)" Seattle Times, May 15, 1957.

"BECK MISUSED UNION POSITION IN 52 INSTANCES, SAYS PROBER." (There then follows in the body of the article a detailed list of 52 instances of alleged misuse by appellant of his union position.) Seattle Times, May 16, 1957.

"SENATE DOCUMENT CHARGES BECK 'TOOK' $300,000." Seattle Post Intelligencer, May 17, 1957.

"McCLELLAN BLASTS BECK FOR 'RASCALITY.'" Seattle Post Intelligencer, May 17, 1957.

The grand jury was impaneled on May 20, 1957. After explaining the general qualifications of grand jurors, the court examined each prospective member as to his or her particular qualifications to act as grand juror. These ques-

tions related to the juror's occupation, whether he had ever been a member of the teamsters' union (or any affiliate thereof) or an officer in any union. He was further asked if he were acquainted with any officer of the teamsters' union. One prospective juror was asked if he knew appellant and he replied in the negative. The final question which the court asked each prospective juror was:

"Is there anything about sitting on this grand jury that might embarrass you at all?"

The court excused five prospective jurors[5] and examined five more in the same manner. The seventeen persons then in the jury box were accepted as constituting the grand jury and the court administered the oath to them.

It is to be noted that none of the jurors who were accepted was asked if he had read anything about the alleged activities of the officers of the teamsters' union in the Seattle newspapers or in nationally circulated magazines, particularly those articles relating to the proceedings before the Senate Committee. Neither was any juror asked if he had heard any part of these proceedings on the radio or had seen them "live" on television. Nor was there any interrogation of the jurors had to ascertain whether any of them had heard or participated in any discussions concerning these matters. The general question as to whether the jurors would be embarrassed in any way in sitting on this grand jury was, in my opinion, not sufficient to disclose any bias or prejudice (conscious or unconscious) on the part of the jurors.

In view of the unprecedented publicity which had been given to the Senate Committee hearings within the three months preceding the impanelment of the grand jury, I think that the jurors should have been interrogated for the

---

[5]Two of the five prospective jurors excused by the court volunteered that they had been prejudiced by reading newspaper articles and seeing television broadcasts. Another was asked if he knew appellant and he replied in the negative. This was the only instance of the court's referring to appellant by name, although the court's later reference to the president of the teamsters' union undoubtedly was understood by the jurors to mean appellant.

existence of possible bias and prejudice against the officers of the teamsters' union.

The authorities bearing on this subject will be discussed after I review the court's charge to the grand jury.

## The Court's Charge

The court explained the historical background and functions of the grand jury, and commented on the fact that it had been used so infrequently in this state that most people, even lawyers, were unfamiliar with its procedure and underlying purposes. The court then outlined the manner in which the grand jury was to perform its functions.

The court stated the reasons for calling this grand jury as follows:

"We come now to the purpose of this grand jury and the reasons which the judges of this court thought sufficient to justify the expense to the county, and the inconvenience to and sacrifice by you, which this grand jury session will require.

"It seems unnecessary to review the recent testimony before a Senate Investigating Committee except to say that disclosures have been made indicating that officers of the Teamsters Union have, through trick and device, embezzled or stolen hundreds of thousands of dollars of the funds of that union—money which had come to the union from the dues of its members. It has been alleged that many of these transactions, through which the money was siphoned out of the union treasury, occurred in King County. Such crimes, if committed, cannot be punished under Federal law, or under any law other than that of the State of Washington, and prosecution must take place in King County. The necessary criminal charges can only be brought in this county upon indictment by the grand jury or information filed by the prosecuting attorney.

"The president of the Teamsters Union has publicly declared that the money he received from the union was a loan which he has repaid. This presents a question of fact, the truth of which is for you to ascertain.

"You may find that many of the transactions happened more than three years ago; this would raise the question of the statute of limitations, which ordinarily bars a prosecution for larceny after three years. There are some instances, however, where the period is extended. This is a question

of law and you should be guided by the advice of the prosecutors on this and similar questions. Your investigation may conceivably result in the adoption of better standards of conduct for union officials.

"Some other inquiries suggested by the Senate investigation are the relationship between the officers of the Teamsters Union and a certain insurance broker; an alleged conspiracy between business men and Teamster officials in fixing prices; and the influence wielded by Teamster officers through campaign contributions to public officials.

"To completely investigate all of these items may be beyond the energy and endurance of yourselves, the prosecutors and their investigating staff. The financial burden of such a complete investigation may be beyond the resources of King County. I urge you to do all that you can within practical limitations to ascertain the truth or falsity of these charges."

After designating the foreman of the grand jury, the court said:

"Now, members of the grand jury, that is all I have to say to you in the way of a formal charge. I think you all realize that your names have been selected right from the jury list which in turn is picked from the voters' registration books. You have a most serious task to perform and I know you realize it is being performed, and is to be performed, by a grand jury picked at random from among the citizens in this community, and thus we hope to keep the law close to the people. It is a tremendous responsibility, and I wish you well in your work."

The court then introduced the prosecuting attorney, one regular deputy, two special prosecuting attorneys for the grand jury and the official court reporter, and terminated its charge.[6]

While the charge contained this admonition, "Your deliberations are secret and you are forbidden by law to disclose the vote, or even the discussion, on any question before you," no warning was given the jurors about refraining from

---

[6]Appellant, in assignment of error No. 27, asserts that unauthorized persons appeared before the grand jury, and contends that the indictment should be dismissed for that reason. In view of the conclusion I have reached on other assignments, I do not find it necessary to discuss No. 27.

reading newspaper or magazine articles relating to officers of the teamsters' union while they were serving as grand jurors; nor was there any admonition given the grand jurors about not listening to radio or television programs pertaining to the conduct of these officers.

On the afternoon of the day that the grand jury was selected and sworn, two articles appeared in the Seattle Times concerning appellant. The headlines read:

"BECK OUSTED FROM A.F.L.-C.I.O. POSTS—TEAMSTER CHIEF FOUND GUILTY OF 'VIOLATING TRUST.'" Seattle Times, May 20, 1957.

"SOLON DENIES INFRINGING BECK'S RIGHTS." ("'May I say that the committee has not convicted Mr. Beck of any crime, although it is my belief that he has committed many criminal offenses.'") Seattle Times, May 20, 1957.

The following morning, the Seattle Post Intelligencer carried this headline:

"McCLELLAN LAYS 'MANY CRIMINAL' ACTS TO BECK." Seattle Post Intelligencer, May 21, 1957.

Between that date (May 21, 1957) and July 12, 1957, when appellant was indicted, two nationally circulated weekly magazines published articles entitled:

"THE CASE AGAINST DAVE BECK AS SENATORS SEE IT." U. S. News & World Report, May 24, 1957.

"A CITY ASHAMED—DAVE BECK IS ON SEATTLE'S CONSCIENCE." Time, May 27, 1957.

I shall now discuss the arguments of counsel relating to assignments of error No. 25 and No. 26.

The motion to set aside and dismiss the indictment was based upon *RCW 10.40.070*, which provides that an indictment *must* be set aside when it appears:

"(4) That the grand jury were not selected, drawn, summoned, impaneled, or sworn as prescribed by law."

It is appellant's contention that the grand jury was not impaneled as prescribed by law in that there was no interrogation by the trial court designed to enable it to determine whether or not any juror possessed a state of mind which would render him unable to act impartially and without

prejudice. To this is added the further contention that the trial court's charge to the grand jury was prejudicial to appellant.

My examination of the portion of the record relating to these matters convinces me that appellant's contentions are well taken.

The statutes of this state relating to grand juries clearly demonstrate the legislative intent to adopt the principle that the grand jury must be impartial and unprejudiced.

"No complainant who may institute a prosecution shall be competent to be present at the deliberations of a grand jury, or vote for the finding of an indictment." RCW 10.28.140.

"Challenges to individual grand jurors may be made by such person for reason of want of qualification to sit as such juror; and when, in the opinion of the court, a state of mind exists in the juror, such as would render him unable to act impartially and without prejudice." RCW 10.28.030.

In *Watts v. Washington Territory,* 1 Wash. Terr. 409, this court, in overruling a challenge to the grand jury proceedings, pointed out that there had been no claim by the defendant that any of the grand jurors were biased or prejudiced.

In *State ex rel. Murphy v. Superior Court,* 82 Wash. 284, 144 Pac. 32 (1914), we upheld the right of the trial judge to excuse certain prospective jurors and stated:

"That it was the policy of the legislature to preserve the right to have *an unbiased and unprejudiced* jury and *grand jury,* and that no suspicion should attach to the manner of its selection in all cases, cannot be questioned. . . ." (Italics mine.)

In *State v. Guthrie,* 185 Wash. 464, 56 P. (2d) 160 (1936), this court, in denying a motion to quash an indictment, cited the *Murphy* case, *supra,* and the above quotation therefrom with approval and discussed the statute now codified as RCW 10.28.030 (quoted above) as follows:

"While this section may be said to relate to challenges made by interested persons, it is not to be construed as denying to the court the right, upon its own motion, to excuse a juror deemed to be disqualified or incompetent. To deny

this right would be out of harmony with the policy of the law, *which charges the court with the responsibility* of insuring that qualified and impartial grand jurors are secured." (Italics mine.)

. Thus, our consideration of this case should be based upon the premise that appellant, as a matter of law, was entitled to an impartial and unprejudiced grand jury. Although the state in this case does not take issue with this premise,[7] the majority holds that appellant is not concerned with anything that takes place before his trial begins.

In my opinion, we should view the circumstances of this case realistically and in a reasonable manner. As I read the record, a consideration of the facts of this case thus viewed

---

[7]The state has filed a comprehensive brief consisting of one hundred fifty pages containing the following answer to appellant's argument regarding his right to an impartial and unprejudiced grand jury:

"Appellant asserts that the denial of his motion to set aside the indictment constituted error under our statutes and constitution and the constitution of the United States (App. Br. 35).

"Appellant cites . . . [citations omitted]. *Except for citing the well-recognized rule that grand juries should be impartial and unprejudiced* (App. Br. 37), the cases are not otherwise applicable." (Italics mine.)

At page 48 of the state's brief, it is stated:

"It is patent that the indictment herein was endorsed 'a true bill' and signed by the foreman of the grand jury and that it was presented and marked 'filed' (Tr. 1). Thus, under the statute, the only grounds defendant could raise on a motion to set aside the indictment were those enumerated in subsections (3) and (4) of RCW 10.47.070 [*sic* RCW 10.40.070]. It is submitted that none of the other grounds enumerated in defendant's motion to set aside and dismiss the indictment were provided for by our statutes.

"The grand jurors were selected, drawn, summoned, impaneled and sworn as prescribed by law. Defendant in his motions and affidavits made no allegation relating to the selection, drawing, summoning, impanelment and swearing of the grand jury *except his assertion that the court took no steps 'to exclude from the grand jury any person or persons who entertained an attitude of bias, prejudice and hostility toward the defendants by reason of knowledge' of purported facts outlined by the defendant in his affidavit 'or by reason of belief or opinion gathered from the widespread circulation of publicity with respect thereto' and 'no steps were taken to instruct or direct the grand jury to ignore or disregard the reports circulated . . . or to disregard any attitude or opinion which they might have formed as a result thereof.'* (St. 2140)."

can only lead to the conclusion that some, if not all, of the grand jurors had already formed certain unfavorable opinions regarding appellant's alleged conduct.

To do otherwise, would seem to be contrary to all human experience. Yet, at no time were any of the prospective jurors asked if they had formed an opinion, and, if so, whether such fact would prevent them from participating fairly in an impartial investigation of the matters later referred to in the court's charge.

Furthermore, no instruction was ever given them as to the legal significance to be attributed to the newspaper statements that appellant had invoked the Fifth Amendment privilege some two hundred fifty times in declining to answer questions before the Senate Committee. Yet, such fact was the subject of much comment in the various news media. As stated in *Grunewald v. United States*, 353 U. S. 391, 1 L. Ed. (2d) 931, 77 S. Ct. 963, 62 A. L. R. (2d) 1344, where the court, in discussing the right to invoke this constitutional privilege, quoted from Griswold, The Fifth Amendment Today:

" 'Too many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are either guilty of crime or commit perjury in claiming the privilege.' "

The failure of the court to interrogate the jurors for the existence of possible bias and prejudice against the officers of the teamsters' union constituted prejudicial error.

The effect of this error was further magnified by the court's charge to the grand jury. The jurors were not instructed to base their deliberations solely upon the evidence presented to them during the course of their investigation. On the contrary, the court's charge seemed to indicate that the so-called disclosures of the Senate Committee were worthy of their consideration. Instead of instructing the jurors that they must wholly disregard the "testimony" before the Senate Committee, the court expressly brought it to their attention, and then stated the substance of the committee's conclusions as to appellant's conduct. Indeed, the language used implied that the court felt that the grand

jurors must already be aware of these matters because of the widespread publicity accorded the Senate hearings.

The court stated that the president of the teamsters' union had publicly stated that the sums received by him from the union were a loan, and that it was the function of the grand jury to investigate this matter and determine the truth in that regard. As stated in *Fuller v. State,* 85 Miss. 199, 37 So. 749:

" . . . every man, whether accused or not, is entitled to the presumption of innocence until legally convicted. This presumption is binding upon the petit jury, and stands as a witness in favor of the defendant when on trial. *It guards him before the grand jury until their investigations have produced proof believed by them which overthrows it. It protects him from the circuit judge in his charge to the grand jury, and forbids that any word from that high station,* so apt, on account of its dignity and importance, to influence by its slightest utterance, *should prejudice the grand jury when it enters upon the consideration of violations of the law.*" (Italics mine.)

The last assignment which it is necessary to notice is No. 28, which relates to the alleged misconduct of the prosecuting officers before the grand jury during the examination of the witness, Fred Verschueren, Jr., who was bookkeeper for the Joint Council of Teamsters No. 28.

The testimony of this witness before the grand jury covers one hundred eighty six pages of the record and is too long to paraphrase in this opinion. Suffice it to say that he was subpoenaed and first testified on June 20, 1957, regarding the handling of certain funds. He was excused after completing his testimony on that day.

On July 10, 1957, he voluntarily appeared and asked to correct some errors in his testimony. He said he did so at the suggestion of his own counsel. In his testimony on this occasion he told about having in his custody two envelopes containing currency which he was holding for appellant. He was excused temporarily to go back to his office and bring these envelopes to the grand jury room. He did so, and the contents of each envelope was counted. There was

$3,100 in one envelope and $3,500 in the other. Included in one envelope were two $500 bills.

Mr. Verschueren's recollection was rather vague on some details, and his explanations regarding the change in his testimony since his June 20th appearance irked the three prosecuting officers who took turns cross-examining him.

Each of them threatened the witness in various ways: (1) With prosecution for perjury *four* times (penalty fifteen years in the penitentiary—"there is no reason for you to go to the penitentiary for somebody else"); (2) invited him to take a lie detector test; (3) threatened to send the envelopes to the Federal Bureau of Investigation to find out if the witness were lying about having sealed and unsealed them. Another instance of badgering this witness was when one of the prosecuting officers said to the witness that he (the interrogator) knew that one could not get a $500 bill from a teller's window at a bank except by special request, and that "we are going to assume . . . that is correct." At another point, a prosecutor stated to the witness: ". . . nobody in the room [being the grand jury and four prosecuting officers] believes one word you say."

The affidavit of appellant's counsel states on information and belief that there was such loud talking in the grand jury room that it was audible in the hall outside.

The State Grand Jury Handbook, prepared under the auspices of the Section of Judicial Administration of the American Bar Association (1959), states as follows regarding the interrogation of witnesses before grand juries by prosecuting officers or jurors:

"All questioning should be impartial and objective, without indicating any viewpoint on the part of the questioner."

The questioning of the witness Verschueren in this case could hardly be described as objective. Neither was the viewpoint of the interrogator concealed when he attempted "to testify" as to the only possible way to get a $500 bill at a bank and further stated, in effect, that no member of the grand jury believed a word the witness said.

In order that there may be no assertion that the above

described comments on the conduct of the prosecuting officers are not accurate, the pertinent portions of Mr. Verschueren's examination are set forth in Appendix A below.

The functions of a prosecuting officer with respect to the grand jury are limited to the giving of legal advice (upon request) and the examination of witnesses. Our statute and the decisions from other jurisdictions indicate the scope of these functions and are discussed below.

RCW 10.28.070 provides:

"The prosecuting attorney shall attend on the grand jury for the purpose of examining witnesses and giving them such advice as they may ask."

I do not think that the phrase "examining of witnesses" includes threats, arguments, and comments upon the evidence such as were made in this case. In *United States v. Wells*, 163 Fed. 313, the court, in speaking about the duties of the prosecutor with respect to the grand jury, stated:

" . . . the provision that the prosecuting attorney may at all times appear before the grand jury for the purpose of giving information or advice relative to any matter cognizable by them, was meant to confine him to those traditional duties of giving advice concerning procedure and the like, to the examination of witnesses, as expressly provided, and not to the expression of opinions or the making of arguments. . . ."

Nor is it proper for the prosecutor to state facts which have no relevancy to the guilt or innocence of the person under inquiry (*Attorney General v. Pelletier*, 240 Mass. 264, 134 N. E. 407 (1922)); or to pass on the credibility of witnesses (*People v. Benin*, 61 N.Y.S. (2d) 692, 186 Misc. 548 (1946)); or in any way influence or direct the grand jury in its findings. *Williams v. State*, 188 Ind. 283, 123 N. E. 209 (1919).

The responsibility of the prosecutor in the trial of a criminal matter is discussed in *State v. Case*, 49 Wn. (2d) 66, 298 P. (2d) 500 (1956), where we quoted from *People v. Fielding*, 158 N. Y. 542, 547, 53 N. E. 497 (1899) these words:

" 'Language which might be permitted to counsel in sum-

ming up a civil action cannot with propriety be used by a public prosecutor, who is a *quasi*-judicial officer, representing the People of the state, and presumed to act impartially in the interest only of justice. If he lays aside the impartiality that should characterize his official action to become a heated partisan, and by vituperation of the prisoner and appeals to prejudice seeks to procure a conviction at all hazards, he ceases to properly represent the public interest, which demands no victim, and asks no conviction through the aid of passion, sympathy or resentment.' "

See, also, *State v. Reeder,* 46 Wn. (2d) 888, 285 P. (2d) 884 (1955), and cases cited therein.

Thus, if it is the duty of the prosecutor to conduct himself as a *quasi*-judicial officer in a contested criminal trial in the presence of a judge, how much more essential it is that he do so in a secret and uncontested grand jury proceeding before seventeen laymen without the presence of a judge.

The conduct of the prosecuting officers in this case can hardly be characterized as *quasi*-judicial. Rather it is best described in the following quotation from *United States v. Wells, supra,* which involved a grand jury proceeding:

" . . . a commendable zeal, which gathered force as it progressed, finally expanded into an exaggerated partisanship wholly inconsistent with the semijudicial duties of a public prosecutor, and entirely unnecessary in the execution of the powers reposed, . . ."

The only case I have found which even remotely resembles the one at bar, in so far as it pertains to misconduct of prosecuting officers before the grand jury, is *Commonwealth v. Bane,* 39 Pa. Dist. & Cy. Rep. 664. There the defendants themselves were the witnesses before the grand jury, and the court quashed the indictment because the investigation was conducted by the Commonwealth's counsel in a prejudicial manner, in that the testimony of the defendants was openly derided and they were denounced as hypocrites and liars and were exhorted to repentance and confession in a highly emotional and dramatic manner, the court stating:

"While it is the duty of the Commonwealth's counsel, as

well as his privilege, to attend upon the grand jury with matters upon which they are to pass, to aid in the examination of witnesses, and to give such general instructions as they may require, any attempt on his part to influence their action or to give effect to the evidence adduced is grossly improper and impertinent: . . ."

The difference between the misconduct in the *Bane* case, *supra,* and that before us here is one of degree only. The witness Fred Verschueren, Jr., on his second appearance before the grand jury, was giving testimony favorable to appellant. His credibility was for the grand jury to pass upon without any comment from the prosecuting officers. It could well be that his testimony was disbelieved by the grand jury solely as a result of the conduct of the prosecuting officers as shown in Appendix A.

Whether such conduct, in and of itself, would be sufficient to invalidate the indictment or not, it is not necessary to determine. However, it could only serve to further prejudice the grand jury, and, when taken in conjunction with the other errors previously discussed, deprived appellant of the right to an unprejudiced and impartial grand jury as contemplated by the law of this state.

The errors on the part of the court in impaneling and charging the grand jury were no doubt due, in large part, to the infrequent occasions when grand juries have been called in this state. The court itself commented on this fact in its charge to the grand jury when it said that most people, even lawyers, are generally unfamiliar with grand jury procedure.[8] However, the fact remains that appellant, be he guilty or innocent, was entitled to a fair and impartial investigation of his conduct in accordance with the forms of the law before a valid indictment could be found against him. I am of the opinion that this right was denied him. As the supreme court of the United States said, in *United States v. Hoffman,* 341 U. S. 479, 95 L. Ed. 1118, 71 S. Ct. 814:

---

[8]During the forty years preceding the calling of this grand jury, there had been only seven grand jury sessions in King county.

"The signal increase in such litigation emphasizes the continuing necessity that prosecutors and courts alike be 'alert to repress' any abuses of the investigatory power invoked, bearing in mind that while grand juries 'may proceed, either upon their own knowledge or upon the examination of witnesses, to inquire . . . whether a crime cognizable by the court has been committed,' *Hale v. Henkel*, 201 U. S. 43, 65 (1906), yet 'the most valuable function of the grand jury . . . [has been] not only to examine into the commission of crimes, but to stand between the prosecutor and the accused,' *id*. at 59. Enforcement officials taking the initiative in grand-jury proceedings and courts charged with their superintendence should be sensitive to the considerations making for wise exercise of such investigatory power, not only where constitutional issues may be involved but also where the noncoercive assistance of other federal agencies may render it unnecessary to invoke the compulsive process of the grand jury."

## CONCLUSION

My conclusion, based on the record herein and the decisions hereinabove referred to, is that two rules of law are applicable to the instant case:

1. That appellant is entitled to the presumption of innocence at all stages of this proceeding from the impaneling of the grand jury to the close of the trial before the petit jury. This right cannot be denied him because of any proceedings had before the Senate Committee.

2. The selection of an unprejudiced and impartial grand jury to determine whether appellant should be indicted or not is just as much an essential part of the law of this state as the selection of an unprejudiced and impartial petit jury impaneled to try him and render a verdict of guilty or not guilty of the offense charged in the indictment.

It is no answer here to argue that the state could have elected to proceed against appellant by information. The fact remains that the grand jury procedure was used. Thus, it was mandatory that the state comply with those statutes, which have been in effect in this state (and territory) since 1854, granting appellant the right to an impartial and unprejudiced grand jury.

This court, in *State v. Devlin*, 145 Wash. 44, 258 Pac. 826

(1927), defined a fair trial. That definition applies *mutatis mutandis* to a grand jury investigation. In the cited case, we said:

"The question involved is that of a fair and impartial trial. In *State v. Pryor,* 67 Wash. 216, 121 Pac. 56, this court said:

" 'A fair trial consists not alone in an observation of the naked forms of law, but in a recognition and a just application of its principles.'

"It is the law of the land, a right vouchsafed by the direct written law of the people of the state. It partakes of the character of fair play which pervades all the activities of the American people, whether in their sports, business, society, religion or the law. In the maintenance of government to the extent it is committed to the courts and lawyers in the administration of the criminal law, it is just as essential that one accused of crime shall have a fair trial as it is that he be tried at all, whether he be guilty or not, has his picture in the rogue's gallery or not. In the *Pryor* case just referred to, it was said that it must be remembered, as stated in *Hurd v. People,* 25 Mich. 404, 'that unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained is unjust and dangerous to the whole community.' "

Despite the public indignation created by the widespread publicity resulting from the senate hearings, appellant was entitled to the same unprejudiced and impartial grand jury investigation as the law of this state guarantees to every citizen whether he be prominent or obscure. For one hundred five years, it has been the duty of our courts, as prescribed by both the territorial and state legislatures, to see that a state of mind does not exist in any prospective grand juror which would render him unable to act impartially and without prejudice. In my opinion, this statutory duty was not performed in this case, and hence the grand jury was not impaneled as prescribed by law.

Before concluding this dissent, I wish to briefly notice certain statements contained in the majority opinion. The majority takes the position that the only statutory provisions that grand jurors in this state are required to be impartial and unprejudiced are found in RCW 10.28.010 and

RCW 10.28.030, and that these provisions apply only to persons already in custody or held to answer for an offense. The majority opinion then states:

"There was a *reason* for such a challenge by a 'person in custody or held to answer for an offense,' but the appellant was not such a person." (Italics mine.)

It seems to me that the only *reason* the legislature granted to a person in custody or held to answer for an offense the right to be investigated by an impartial and unprejudiced grand jury, is that the grand jury's attention had been focused upon him from the commencement of its investigation. That is precisely the situation of appellant here. There could not be any doubt in the minds of the prospective jurors that this grand jury had been convened to investigate appellant. As mentioned above, not only did the newspapers announce, less than three weeks before the impanelment, that appellant was to be investigated by the grand jury, but, also, the trial court, in its charge, instructed the grand jury that the president of the teamsters' union had publicly stated that the sums received by him from the union (which the Senate Committee stated were stolen) were loans which had been repaid, and that this issue presented a question of fact for the grand jury to resolve.

I do not understand how it can be said, under the facts shown in this record, that the *reason* entitling a person in custody or held to answer for an offense to be investigated by an impartial and unprejudiced grand jury, does not apply equally well to appellant. It is axiomatic that all men are equal before the law and are entitled to the same rights *under the same or similar circumstances.*

The majority opinion continues with the following statement:

" . . . When a modern grand jury starts its investigative process it seems ridiculous to suggest that as each new personality comes under scrutiny the proceedings must stop until it can be determined whether any member of the grand jury is biased or prejudiced against him; and, if a grand juror is so biased or prejudiced, the investigation is at an end. . . . "

Our duty is to apply the law to the facts of *this* case, and the above-quoted statement has no application to appellant. He was not some new personality who had come under the scrutiny of the grand jury during the course of its investigation. Rather, the court made it clear, in its charge, that the primary purpose of convening this grand jury was to investigate his activities as an officer of the teamsters' union. Appellant was a person whose conduct the trial court, in its charge, specifically directed the grand jury to investigate.

The majority further states that there is no showing here of bias or prejudice. My answer is that if, in the face of all the publicity regarding the Senate Committee hearings described above, anyone realistically could believe that there was no showing of bias and prejudice against appellant at the time of the impanelment of the grand jury, then it is impossible ever for anyone to make such a showing.

But, appellant's complaint is that the grand jurors were never interrogated by the trial court *to determine* if any bias or prejudice existed. In the absence of such interrogation, appellant necessarily must rely on the facts stated as indicating what such an interrogation would have disclosed as to bias or prejudice. Under the evidence here, it would be wholly unrealistic to presume that the grand jury was unbiased and unprejudiced.

The majority concludes its discussion of the grand jury proceedings with the statement that even if there were sufficient irregularities in the present case to warrant quashing the indictment, appellant could not be prejudiced, since there is no constitutional or statutory right to a grand jury in this state.

Whether or not there is a constitutional or statutory right to a grand jury in this state is, in my opinion, totally immaterial. What is controlling here is the fact that the state elected to proceed against appellant by indictment rather than by information. Therefore, having so elected, the state was bound to comply with the statutes relating to grand jury procedure.

The majority opinion relies chiefly on decisions rendered by Federal courts whose grand juries need not be composed

of impartial and unprejudiced jurors, because no statute or rule of court prescribes that qualification. Whether the Federal system or that ordained by the legislature of this state is preferable, is not for this court to declare. Any and all branches of government must comply with applicable constitutional and statutory requirements in the performance of their functions. This includes the grand jury. Until the legislature amends or repeals the statutory law, quoted and emphasized above, it must be applied with equal effect to every person whose conduct is under investigation by a grand jury pursuant to the court's charge to it.

For the reasons stated herein, it is my opinion that the order of the superior court denying appellant's motion to set aside and dismiss the indictment should be reversed and the cause remanded with directions to grant the motion.

FINLEY, ROSELLINI, and HUNTER, JJ., concur with DON-WORTH, J.

APPENDIX A (to dissenting opinion)

Excerpts from examination of Fred Verschueren, Jr., by prosecuting officers before the grand jury July 10, 1957. (All italicized portions are those referred to in the attached opinion.)

"Q. Mr. Verschueren, I want to warn you at this time that you are under oath and that what you say here, if found to be false, can be perjury and you could be guilty of perjury for testifying falsely under oath. A. Yes sir. Q. You are under oath. A. Yes sir. Q. *And the penalty for perjury is fifteen years in the penitentiary, it is a felony.* A. Yes sir. Q. Now, I want to give you every opportunity to state the truth. . . . Q. You know that. Do you want to tell us when he [appellant] signed this? You still say he signed this in October of '54 when he gave it to you? Do you want to change your testimony or not? A. I don't care to change my testimony. He must have signed it. Q. *We want to know the truth.* A. I am telling you the truth, Mr. ‗‗‗‗‗ Q. All right. Mr. ‗‗‗‗‗ asked you about these envelopes. *He told you about the penalty for perjury.* You are the person that is on the stand, you are the person under oath down here, do you understand that? A. Yes sir. Q. We are concerned with one thing and one thing only,.

the truth. A. Yes sir. Q. Now, Mr. Beck gave you this envelope in October, 1954, is that your testimony? A. Either that one or the other one, sir. Q. This is Mr. Beck's hand-writing, is it not? A. Yes. Q. He handed you this envelope with his handwriting on it at one time and one time only, isn't that true? A. Yes, but it is not necessarily the one he handed me in October of '54. Q. I thought you testified to Mr. ................. it was the first envelope that had Western Conference on it, the other envelope, other material he gave you at a different time. You testified the first envelope he gave you had Western Conference and Joint Council on it. A. I believe so. Q. That is the one he gave you October of '54, isn't that correct? A. Well, you are con-fusing me now. Q. I am not trying to confuse you, sir. *I want you to tell the truth.* A. I am telling the truth. Q. *There is no reason for you to go to the penitentiary for somebody else.* A. I am not even thinking about that, sir. Q. *Well, I am thinking about that, sir.* A. I am telling you the truth so far as I know it. Q. Let us know the truth, if you will. This is the envelope you got in October of '54 (indicating) A. I believe that is the one, yes sir. Q. That is your testimony. A. To the best of my recollection, yes sir. . . . Q. Why would he send a check down to you when he had several thousand dollars in cash? He testified as much as $10,000 in his safe at his own home. Why would he send a check down to you to cash. *Maybe you can answer that.* A. I couldn't say, sir. Q. Do you want to hazard an answer? *It isn't because you are lying, is it?* A. No sir. I have cashed, many, many checks for Mr. Beck. Q. Mr. Beck would send his personal checks down to you to cash? Mr. Beck sat on that stand and testified he didn't write two checks a year. A. I said checks made out to him and he would send them down, endorse them. Q. Isn't there a bank right next door to your place of business? A. Yes. Q. But he would send them to you to cash out of some fund in the vault? A. He wouldn't necessarily know I was cashing them out of that fund. Actually I could have cashed them out of the office generally, but there were some cir-cumstances where I couldn't. Q. Mr. Beck testified this morning all his checks were channeled through the B & B Investment Company. That is his testimony this morning, that he never bothered with financial matters, his wife took care of the home and all her expenses and everything else went through the B & B and he wrote maybe two checks a year, he wouldn't even say that many. Is your testimony consistent with that, Mr. Verschueren. A. No. Q. *It isn't*

*very consistent, is it?* A. I am only telling you what is the truth. Q. *You are telling the truth?* A. Yes. Q. *Are you saying Mr. Beck lied to us this morning?* A. No sir, I wouldn't say so. Q. One of you must be mistaken then, is that correct? When did you talk to Mr. Beck last about your testimony here on the stand? A. I have never talked to him about my testimony on the stand. Q. Have you talked to him about this money in the vault in the last few days? A. No sir. Q. *You came in here cold and didn't know what you were going to testify about, is that it?* A. I had a fair idea. Q. You haven't talked to Mr. Beck, Sr., in the past several days or several weeks? A. I have talked with him, but not about the money, no sir. Q. You didn't talk about these envelopes in the safe? A. No sir, only that one time. Q. It dovetails pretty well with his testimony, doesn't it, fortunately? A. I don't know, sir. . . . Q. These checks you cashed for Dave Beck, Sr. How much were they? A. Oh, varying amounts. Not any of them very high. Q. How much? A. Mr. ..................., I can't remember all those checks. Q. You are going to be here a long time remembering. You are just starting. When I get through with you Mr. ................... is going to take over again. *We don't think you are telling the truth so we are going to stay with you for a while.* How much did you cash checks for Dave Beck, Sr. for? . . . Q. Do you deal in $500 bills? A. No sir, I don't personally. Q. I have never seen one before. This is amazing. Somebody gives you a $500 bill and you have no recollection of it. You sit there and tell me somebody would give you a $500 bill and you wouldn't remember who gave it to you. Is that your testimony? A. If they gave it to me personally? Q. If they came in—if it came into your possession by reason of having cashed a check or something? A. Sir, the amounts are all I count, if I have the proper amount of money. Q. I realize that. Let's not talk about that. Somebody handed you a $500 bill, didn't they? A. Yes. Q. Who did, and under what circumstances. A. Well, as I say, the odds are— Q. Never mind the odds. We are talking about what the facts are. I am not interested in the odds. What are the facts? Who gave you the $500 bill? A. It probably came from the bank, yes. Q. Probably? A. It could have come over the counter. Q. Did you go to the bank and get those two $500 bills, or didn't you? Did you or didn't you? A. I don't definitely recall, sir, whether I did or not. Q. You don't know whether you went to the bank and got a $500 bill or somebody gave it to you. A. Whether it came over

the counter, no, I don't sir. Q. *You expect these people [the grand jury] to believe you would come into possession of a $500 bill—* . . . Q. You already said you probably went to the bank and got it. A. With the checks I cashed. Q. Why would you ask for a $500 bill in the bank? A. I probably didn't ask for a $500 bills, but they may have given me one. Q. You accepted it? A. Yes. Q. You couldn't cash a check with a $500 bill, when you got it. A. No sir. Q. Then— A. There was ample funds generally exclusive of this amount then I probably don't think it would make any difference if I had $1,000. Q. Not what you think now, then, what did you think then when they gave you the $500 bill and who gave it to you and what went through your mind. Something went through your mind, mister. What went through your mind when you got the $500 bill and who did you get it from. Tell this jury who you got it from? A. Well, I must have gotten it from the bank, sir, or else it came over the counter in the— Q. Not what must have been done. What did you do? A. I— Q. I don't care about probabilities. How and when did you get it? A. I definitely do not remember, sir, how I came into possession. Q. *You want this jury to believe you can get a $500 bill* and don't know the circumstances under which you got it. I am 51 years old and I haven't seen one of them yet. How old are you? A. 36. Q. How many of these $500 bills have you seen in your life? A. (No response) Q. Well, how many? A. I am trying to think, sir. Q. It isn't very many, is it? A. Yes, considerable. Q. I thought you testified a little while ago you had only seen a few of them. *You just got through testifying under oath you had only seen a few of them. Which time are you telling the truth?* A. Well, sir, you are getting me so confused— Q. I am confused? A. No, but I am. Q. *I don't think the jury is confused.* Why should you be confused, *you are supposed to be sitting here telling the truth.* A. Yes. Q. The truth will never confuse you, never. Where did you get that $500 bill, two of them. Where did you get them? Under what circumstances and from whom and how? A. They may have been originals— Q. I am not interested in may have been. How did you get them? Tell me when and where? A. I cannot tell you, sir, definitely how I got them. Q. Two $500 bills and you can't tell how you got them, but you got both by your own testimony in the last three years? A. Yes sir. Q. But you don't know the circumstances. A. No I don't, no. These may be the original bills, sir, I don't know. I don't know. Q. I thought you said you went to the bank and got

those bills? A. Just a moment, you said how did I come into possession of them. They may have been in the envelope originally. Q. Are you willing to testify now you never got those bills, they are the originals? A. No, I can't say that, sir. Q. *Is there anything that you can say definitely as you sit here this afternoon? Is there anything you can say definitely?* A. Yes sir. Q. *It will be a pleasant relief when that happens.* . . . Q. Have you ever received a $500 bill from the bank without making a request for it? They don't keep them in those tills, you know, at all. *You can't get a $500 bill from a teller because they don't keep them there.* Did you know that, sir? Did you know that, first. Answer that question. A. They are there if they have come in that day. Q. *Did you know they don't keep $500 bills at all behind those windows.* They receive them and take them somewhere else. Did you know that? A. No sir, I did not. Q. *You know it now.* A. No, I don't. Q. *I am telling you now.* They don't keep them there. *You can't get a $500 bill without making a request for it,* or a $1,000 bill, *the most you can get is a $100 bill.* Did you know that? From a teller's window? A. No, I did not know that. Q. *We are going to assume,* just for the sake of this discussion then, *that is correct because I know it to be correct. That is what I have been told by people who know.* A. Yes sir. Q. Now, we can get the banker in here and get the same banker you've got out there and I assume he is not an officer of the Western Conference of Teamsters or not a member of your union, is he, the banker out there where you bank? A. Pardon. Q. The bank you go to— what bank do you go to? A. Sixth & Denny Branch. Q. Mr. Beck doesn't own that bank, does he? A. Not to my knowledge. Q. *Well, assume the banker will come in and tell the truth,* can we assume that? A. Yes sir. Q. *He will tell us they don't keep $500 bills in those windows. They don't give them to Fred Verschueren Jr. when he brings in checks, they don't give them to anyone under any circumstances unless they ask for them* because when you present checks and you want cash the teller always says, 'How do you want it, sir?' Don't they? They always say that to you every time, don't they? A. They sometimes say, 'Sir, do you care how you have it?' . . . Q. Not on the payroll, so you wouldn't get $500, you wouldn't make that special request at the bank, so how would that $500 that came over the counter ever get into the envelope? Under what theory could that possibly get in the envelope? That wasn't your practice. You see, you told us your practice

this afternoon, because you realized we wanted to see the envelopes, that you never went to them, you never took anything out and then you went to the union hall and came back and your memory was refreshed in the fresh air and you told us you cashed checks and paid payrolls at times with this money, but each time you would put a I.O.U. in there and then you would adjust it later. Go to the bank and get the money and put it back in here. Mr. ............................ asked you about the $500 bill and you said you could have gotten it from the bank. *We are assuming now, because I know* and I think you are pretty well in agreement, *that you can't get $500 bills unless you ask for them at the bank,* that you couldn't have got it at the bank, so the only possible way you could have received that $500 bill is that it is part of the original money that was put in there *because you couldn't have got it over the counter, because that isn't your procedure.* Nothing you got over the counter could have gone in that envelope. If it could, tell us how. A. Well, I did go through that originally. As I said, I would take monies from the box and— . . . Q. Mr. Verschueren, with reference to this envelope, Exhibit 77, this is the original envelope given to you by Dave Beck in October or November of 1954. This envelope was sealed when you first got it, this is Exhibit 77? A. Yes sir. Q. And you didn't open it again until the early part of 1955. A. Sometime in 1955. Q. Around six months went by before you had occasion to go into it. When you went into it you saw this piece of paper in there. You saw this piece of paper, Exhibit 79 when you opened it with your finger and unsealed it? A. Yes. Q. Then you read the piece of paper. You did whatever you had to do with the money and you resealed it, is that right? A. I am not certain that I resealed it right at that time. Q. But it was resealed when the money was put back in. You always kept these envelopes sealed? A. Not always. Q. You resealed it at that time, after you put the money back, after the first transaction, the first part of '55? A. I won't definitely say I did, no. Q. When did you reseal it after the first transaction, the first time you opened it? A. I couldn't tell you as to dates, sir. Q. Approximately when? A few months after? A. I couldn't even approximate. Q. A year or two years after. Did you leave it open or what? You told Mr. ................ this afternoon that you resealed it right after you opened it. This time you say you didn't. *Why do you hesitate?* A. Well, because I—when you open an envelope innumerable times how do you know which time you sealed it and

didn't? Q. You told Mr. ..........................you opened the envelope and resealed it. He questioned you at length about opening it with your finger and you would reseal it and then I think he went further and asked you whether or not you used any glue on it *and you said no,* and still when we have the envelope in this condition, *it is stuck very well*— and you are getting your two $500 bills back now, don't miss that part on the record. Do I understand you told Mr. .................... you resealed this envelope each time that you opened it? A. Well— Q. Now, you didn't, is that right? A. No, I didn't every time. Did I say I resealed it every time? Q. I don't think you said every time, you said you resealed it the times you opened it and put the money back and resealed it and Mr. .................... was very, very interested, he asked you what kind of glue did you use glue and you said no you didn't. A. I didn't. Q. This must be excellent glue on the Western Conference of Teamsters envelopes because the thing is perfectly sealed now. *Understand we can send the envelope to the F.B.I. and determine from them whether or not it has been resealed numerous times,* or innumerable times as you said. You were in there innumerable times. *You understand that, don't you?* A. Yes. Q. So if you decide all of a sudden here you are going to tell us the truth—*and nobody in the room believes one word you say*—you are telling us now that everything you have testified to here today is the truth? A. Yes sir. Q. You have nothing to hide? A. No sir. Q. And you are perfectly willing to undergo any sort of examination to determine if you are telling the truth, is that correct? A. Yes sir. Q. There is nothing at all that is going to stop you from proving what you said? A. No sir. Q. *If I tell you now that I have arranged to give you a lie detector test, will you take it?* A. I would have to consult my attorney. Q. *Yes, that is what I thought, because you are not telling the truth,* are you? *If you were telling the truth you would have no qualms about taking a lie detector test* because a lie detector will not work on a truthful person. It is an exceptionally fine machine, you can't fool it and you are absolutely a perfect subject because you are young and you have your wits about you *and you would fail miserably unless you are telling the truth. Will you take the test?* A. I have heard differently about the lie detector. Q. Will you take the test? A. No, I will not. Q. You will not. You don't have to consult your attorney do you? *You don't want to take any test, do you?* A. I will consult him first. Q. But you won't take any test, will you? Will you, now?

A. I will consult him first.  Q. *Yes, that is what I thought.*
. . . "

HUNTER, J. (dissenting)—I dissent.  In the instant case, it was not determined that the members of the grand jury were free from bias and prejudice.  This is particularly significant in view of the atmosphere that existed toward the appellant in King county at the time the grand jury was impaneled.

One of the most basic concepts of a judicial proceeding is impartiality.  This concept was announced as essential to a grand jury proceeding by both the legislature and the supreme court of this state, in the statutes and decisions cited in Judge Donworth's dissent.  Under the rule adopted by the majority, a grand jury may be composed of members who are biased and prejudiced.  This rule constitutes such grave error that its application will literally shake the foundation of the judicial system of this state.

The grand jury proceedings should be vacated and set aside.

---

[*En Banc.*    June 14, 1960][9]

Upon rehearing of the matter, the *per curiam* opinion heretofore filed herein was, by order, adhered to by a constitutional majority of the court.

---

August 22, 1960. Petition for rehearing denied.

[9]Reported in 353 P. (2d) 429.